## A09A2109. POTTER v. THE STATE.

(687 SE2d 653)

MIKELL, Judge.

Jason Dewayne Potter was convicted of nine counts of homicide by vehicle in the first degree,[1] two counts of serious injury by vehicle,[2] two counts of driving under the influence of alcohol,[3] and reckless driving. The convictions stemmed from evidence that after an evening of drinking beer, Potter caused a head-on collision that killed three of the five members of the Thomas family, including parents Rock Avery Thomas and Katherine Thomas and their nine-year-old son, Morgan, and seriously injured another child, Logan. The trial court sentenced Potter to an aggregate of 25 years in confinement plus 35 years on probation. Pursuant to the grant of an out-of-time appeal, Potter asserts that the state failed to prove the chain of custody of his blood sample and failed to lay a foundation for the admission of his blood test results. Potter also contends that the trial court erred by admitting expert testimony on the scientific method of converting a serum alcohol reading into a whole blood alcohol concentration, which is an issue of first impression in this state. Finally, Potter challenges the exclusion of Rock Thomas's two prior traffic citations. Finding no error, we affirm.

Construed most favorably to the verdict,[4] the evidence shows that at approximately 11:00 p.m. on April 2, 2004, Rock Thomas was driving his family home on State Highway 193 in Walker County when their minivan was suddenly struck head-on by Potter's S-10 pickup truck. According to Georgia State Patrol Trooper Heath Stewart, a member of the Specialized Collision Reconstruction Team, Potter was driving 69 mph, well over the 50 mph speed limit on Highway 193, when his truck crossed over the centerline and struck the minivan, which was traveling 45 mph. Rock and Katherine Thomas died at the scene, while Morgan died later at a local hospital. Logan's intestines ruptured due to the impact, necessitating two surgeries and a lengthy hospitalization. Katherine's son, David McKenzie, who was in the back seat, suffered facial injuries.

The evidence further showed that earlier that night, Potter split a 12-pack of beer with his friend Lance McGill. After spending the evening drinking, playing video games, and riding around, Potter dropped McGill off at his residence. Before Potter drove away, McGill

---

[1] OCGA § 40-6-393 (a).

[2] OCGA § 40-6-394.

[3] OCGA § 40-6-391 (a) (1) (DUI less safe), (a) (5) (per se DUI).

[4] See *Merritt v. State*, 288 Ga. App. 89, 91 (1) (653 SE2d 368) (2007).

advised him of the safest route to take home to avoid being caught for DUI.

Multiple witnesses testified to the horrific nature of the collision. Potter was seriously injured and was airlifted by helicopter to Baroness Erlanger Hospital in Chattanooga, where his blood was drawn. Potter's blood sample revealed a serum alcohol concentration of 0.158 grams per deciliter, and he filed a motion in limine to exclude these results. At a pretrial hearing on the motion, Christopher Tillson, who manages the implied consent division of the Georgia Bureau of Investigation ("GBI") state crime lab, testified that the alcohol concentration in a serum or plasma specimen is generally 14 to 20 percent higher than that in a whole blood sample because serum or plasma has a higher water content. However, the Georgia Code defines "alcohol concentration" as "grams of alcohol per 100 milliliters of blood," and the state crime lab presumes that "blood" refers to whole blood.[5] Tillson explained that a conversion factor is applied to the serum sample reading in order to arrive at a blood alcohol result that comports with the statute. In this case, Tillson applied a conversion factor of 20 percent to the serum reading to arrive at a whole blood alcohol concentration of 0.126 grams.

Potter's expert witness, Warren James Woodford, Ph.D., a chemist, testified that the alcohol concentration reported on the hospital blood test did not comport with Georgia law and that no equation could be applied to convert the number with any certainty. Potter argued that the conversion procedure was unreliable and sought to exclude any evidence concerning the results of his blood test on that basis. The trial court denied Potter's motion, allowing both sides to present expert testimony on this issue at trial.

Joy Cochran, a GBI toxicologist, thereafter testified over Potter's objection that giving Potter the benefit of the greatest variance between serum and whole blood alcohol concentration levels, his serum alcohol result translated into a blood-alcohol level of 0.126 grams percent, or roughly one and one-half times the legal limit of 0.08 grams percent. Dr. Woodford gave extensive testimony, concluding that the readings on the serum test could not be converted into a whole blood alcohol concentration with any reliability.

Finally, similar transaction evidence was admitted showing that in 2002, Potter ran his car 400 feet off the road and through a fence. A nearly empty fifth of Jim Beam whiskey was found in his car, and his blood-alcohol level was 0.204.

1. Potter asserts that the state did not adequately prove the

---

[5] See OCGA § 40-1-1 (1): " 'Alcohol concentration' means grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath."

chain of custody of his blood sample. We review the trial court's ruling on the adequacy of the chain of custody under an abuse of discretion standard[6] and find none here.

> Where the [s]tate seeks to introduce evidence of a fungible nature, it must show a chain of custody adequate to preserve the identity of the evidence. The burden is on the [s]tate to show with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution. The [s]tate need not negative every possibility of tampering, and need only establish reasonable assurance of the identity of the evidence. When there is only a bare speculation of tampering, it is proper to admit the evidence and let what doubt remains go to the weight. When a blood sample is routinely handled and nothing in the record raises a suspicion that the blood tested was other than that taken from the defendant, the evidence of tests on such blood is admissible.[7]

In the case at bar, testimony from several witnesses established that the blood sample obtained from Potter was handled in a routine manner. Bryan Goldston, the emergency room technician ("EMT") who drew the blood, testified that he placed the sample in a "vacutainer," marked it with identifying information, and hand delivered it to lab personnel. Beth Broetzmann, the medical lab technician who received Potter's blood sample, testified that it was labeled with his name, his billing account number, the time of collection, and the identity of the EMT who collected it. Broetzmann testified that if the sample had not been properly identified, it would have been discarded, and the problem would have been documented. Broetzmann immediately took the sample to the chemistry department to be tested. Kriss Crutcher, another medical lab technician, testified that he received the sample; that he was asked to run an alcohol level on it; that he performed the test by putting the sample on a properly calibrated Dade Behring Dimension Analyzer; and that the sample has a bar code label, which identifies the patient and the type of test that has been ordered. The Analyzer reads the bar code.

Potter contends that the chain of custody was broken because Broetzmann refreshed her recollection with a document that contained a different medical record number for Potter than the number

---

[6] *Smith v. State*, 291 Ga. App. 353, 355 (3) (662 SE2d 176) (2008).

[7] (Citations and punctuation omitted.) *Hurst v. State*, 285 Ga. 294, 296 (2) (676 SE2d 165) (2009), citing *Cunningham v. State*, 255 Ga. 35, 38 (5) (334 SE2d 656) (1985).

on the test results that were admitted into evidence. The record shows that Broetzmann testified on cross-examination that the patient number on the lab report she was reviewing was 1322842. Defense counsel then showed her a document, which counsel did not identify, and asked whether it was different. Broetzmann replied, "Yes, it is. This number is 2234407." The second number appears on Potter's test results as his medical record number, and he contends that the discrepancy in the numbers creates a suspicion that the blood sample tested was not the one drawn. We disagree.

At the outset, we note that the document used to refresh Broetzmann's recollection was not introduced into evidence, so we are unable to review any purported discrepancies in the numbers. Moreover, Broetzmann explained the discrepancy. She testified that the blood sample was labeled with a name, a billing account number, and a unique "accession" number, so that the specimen was the same even if the medical record numbers were different.

> The discrepancies noted would go to the weight of the evidence and not its admissibility. The weight of the evidence and the credibility of the witnesses are questions for the factfinder. Here, the jury chose to believe the [s]tate's witnesses as to the blood sample[ ], and it was authorized to do so.[8]

It follows that the trial court did not abuse its discretion in admitting the sample into evidence.[9]

2. Potter also argues that the state failed to lay a foundation for the admission of his blood test results under the business record exception to the hearsay rule, OCGA § 24-3-14, rendering the document and any testimony thereon inadmissible hearsay. Potter also complains that the document was hearsay because although it was admitted during the testimony of the medical lab technician who actually performed the test, Crutcher, he did not testify to the actual results. This argument fails for a number of reasons.

Crutcher, who performed the serum alcohol level on the sample, testified that he documented the results in the computer according to "standard operating procedure"; that he performed the test utilizing a properly calibrated analyzer; that the machine was in proper working order at the time he performed the test; that he received the blood sample at 1:00 a.m. and ran the test within ten minutes of receipt; and that the results shown on the computer

---

[8] (Citation and punctuation omitted.) *Lewis v. State*, 215 Ga. App. 486, 489 (3) (451 SE2d 116) (1994) (whole court).

[9] See id.

printout were the results that he obtained when he ran the test. Potter contends this evidence was an insufficient foundation for admission of the sample. However, when the state tendered the computer printout, defense counsel stated only that "we don't feel that the full foundation has been laid for publication." The court admitted the document. Defense counsel then cross-examined the witness thoroughly concerning the accuracy of the machine.

We conclude that Potter's "foundation" objection was insufficient to attack the admission of the document because he did not specify for the trial court the foundational element he contended was lacking.

> Because "lack of foundation" has no single defined meaning, an objection of "lack of foundation" generally is of little or no use to a trial judge. For example, "lack of foundation" can refer to a failure to establish that the item of evidence being offered is the same item it purports to be — often referred to as chain of custody, or it may refer to a failure to establish that the witness is testifying from personal knowledge. Lack of foundation may also refer to a failure to establish that business records meet the requirements of OCGA § 24-3-14 or that a party has not established a witness's qualifications as an expert. Because of the varied meanings for "lack of foundation," a party making an objection for lack of foundation must specify the foundational element he contends is lacking.[10]

Finally, Potter acquiesced in the procedure by which Crutcher identified the computer printout but did not relate the results stated thereon. The record reveals that the prosecutor asked the defense's "preference as to the procedure." The prosecutor explained that he wanted Crutcher "to say the number he received was the one shown in [the printout]," but that it would be admitted for the record so that the next witness, the state's toxicologist, could apply the conversion ratio to the number stated thereon. Defense counsel stated that he had "no problem" with the procedure as long as the document was not being admitted. Thereafter, Crutcher was shown the exhibit and testified that the results shown thereon were the results that he obtained when he ran the test. During redirect examination of Crutcher, the state tendered the test results into evidence "for the record . . . and for the next witness." Accordingly,

---

[10] (Footnotes omitted.) *Tolver v. State*, 269 Ga. 530, 532 (2) (500 SE2d 563) (1998). Accord *Daniel v. State*, 298 Ga. App. 245, 247-248 (2) (679 SE2d 811) (2009).

Potter acquiesced in the lab technician identifying the exhibit but not revealing the results stated thereon. Acquiescence deprives Potter of the right to complain of this procedure on appeal.[11] Moreover, the lab technician testified that the document tendered was an accurate copy of the result he obtained from the testing procedure. Thus, his testimony was properly admitted as original evidence.[12]

Next, the toxicologist testified. After being shown the serum test results, this witness was asked whether, without stating the numerical result, she could convert the number into a whole blood alcohol concentration level. Defense counsel objected that the document had not been "admitted for the contents thereof, just for the record." The trial court ruled, "I'm going to allow it." Potter made no further objection. As stated above, the results were properly admitted, so that the toxicologist's testimony interpreting the results was not hearsay. The trial court did not abuse its discretion in admitting the results of the hospital-administered blood test for the reasons asserted by Potter.

3. Potter next argues that the trial court erred by permitting the state toxicologist to testify as to her opinion of his blood alcohol concentration because the state failed to prove that the method of converting serum alcohol concentration into blood alcohol concentration had reached a scientific stage of verifiable certainty. We disagree.

The test for the admissibility of testimony relating a "novel" scientific procedure is "whether the procedure or technique in question has reached a scientific stage of verifiable certainty, or . . . whether the procedure 'rests upon the laws of nature.' "[13]

> The trial court may make this determination from evidence presented to it at trial by the parties; in this regard expert testimony may be of value. . . . Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty.[14]

In this case, the state's expert witnesses testified that it was generally accepted in the scientific community that ethyl alcohol concentrations measured in a serum sample are between 14 and 20

---

[11] See *Swint v. State*, 199 Ga. App. 515, 518 (2) (405 SE2d 333) (1991).

[12] See *Valdez v. State*, 192 Ga. App. 10, 12 (3) (383 SE2d 611) (1989).

[13] (Punctuation and footnote omitted.) *Harper v. State*, 249 Ga. 519, 525 (1) (292 SE2d 389) (1982).

[14] (Citations omitted.) Id. at 525-526 (1).

percent higher than those in a whole blood sample. Tillson, from the state crime lab, testified at the pretrial hearing that he based his conclusion on a review of numerous scientific studies as well as personal experience analyzing replica samples between whole blood and serum. Tillson concluded that, based on the information provided in the "vast majority" of the scientific literature and his own research, it was highly improbable that the ratio deviated significantly from the 14-to-20 percent range. Potter's expert, Dr. Woodford, testified that the readings on the serum test could not be reliably converted into a number that conformed with Georgia law, and he discussed the various factors that affected the accuracy of this technique, including margins for error. The trial court deemed the conversion ratio testimony admissible and allowed experts from both the prosecution and defense to testify before the jury. Potter argues that the conflicting evidence of the expert witnesses mandated a conclusion that the method of converting a serum alcohol reading into a whole blood alcohol concentration level as required under Georgia law had not been established with verifiable certainty. We disagree.

The Supreme Court has "made clear that the trial court need not exclude scientific evidence simply because it bears some possibility of error."[15] The Court has also concluded that conflicting expert opinions on various test results affect the weight rather than the admissibility of the testimony.[16] We reach the same result in the case at bar. At the outset, we note that the use of a conversion ratio to convert a serum alcohol reading into a whole blood alcohol concentration level has been widely accepted in other jurisdictions.[17] We point out that in *State v. Cardwell*,[18] the North Carolina appeals court determined that the testimony of Potter's expert, Dr. Woodford, disputing the reliability of a conversion ratio of 1 to 1.18, did not preclude the admission of testimony concerning that conversion ratio.[19] The appeals court affirmed a conviction of driving while

---

[15] (Citation omitted.) *Lattarulo v. State*, 261 Ga. 124, 126 (3) (401 SE2d 516) (1991) (affirming the admission of breathalyzer results).

[16] Id. See also *Vaughn v. State*, 282 Ga. 99, 100-101 (2) (646 SE2d 212) (2007) (affirming the admission of testimony regarding the direct sequencing method of mitochondrial DNA analysis); *Chapel v. State*, 270 Ga. 151, 156 (5) (510 SE2d 802) (1998) (conflicting expert opinions on results of DNA testing affect weight of testimony, not admissibility).

[17] See, e.g., *People v. Olsen*, 903 NE2d 778, 785 (II) (B) (Ill. App. 2009); *Datzek v. State*, 838 NE2d 1149, 1161 (II) (Ind. App. 2005); *State v. Kirsch*, 820 A2d 236, 242, n. 5 (Conn. 2003); *Love v. Commonwealth*, 55 SW3d 816, 822 (II) (B) (Ky. 2001); *State v. Cardwell*, 516 SE2d 388, 395-396 (I) (N.C. App. 1999); *Michie v. State*, 632 S2d 1106, 1108 (Fla. App. 1994); *State v. Braden*, 867 SW2d 750, 757 (III) (Tenn. Crim. App. 1993); *State v. Koch*, 765 P2d 687, 690 (I) (Idaho App. 1988).

[18] Supra.

[19] Id. at 392.

impaired, ruling that the trial court properly determined the reliability of the conversion ratio for admissibility purposes and then properly allowed the state and the defense to present evidence "respectively attacking and supporting the reliability" of the conversion ratio.[20] We similarly conclude in the case at bar that the trial court did not abuse its discretion in denying Potter's motion in limine and in permitting the state's toxicologist to testify as to her opinion of his whole blood alcohol concentration, applying a conversion ratio of 20 percent to his serum reading.

4. Finally, Potter contends that the trial court erred in refusing to admit into evidence Rock Thomas's two prior traffic citations showing that he was convicted for speeding in 1999 and for failure to maintain lane in 2002. Potter argued that the victim's conviction for failure to maintain lane was relevant to the cause of the collision. Potter asserted that a factual issue existed as to whether Mr. Thomas may have been in the wrong lane based on Trooper Stewart's testimony concerning the location of gouge marks in the road. But Stewart testified unequivocally that in his opinion, the impact occurred in the lane in which the Thomases were traveling. There was no evidence introduced to the contrary. Moreover, there was no evidence that the victim was speeding at the time of the fatal collision. The trial court therefore excluded his prior traffic citations as irrelevant. "The admission or exclusion of evidence which is objected to on the ground of relevancy lies within the sound discretion of the trial court whose decision will not be disturbed on appeal absent a clear abuse of discretion."[21] The trial court did not abuse its discretion in excluding the evidence at issue.[22]

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED DECEMBER 3, 2009.

*David J. Dunn, Jr., Douglas R. Woodruff, Jad B. Johnson*, for appellant.

*Herbert E. Franklin, Jr., District Attorney*, for appellee.

---

[20] (Citation omitted.) Id. at 396 (I).

[21] (Citation and punctuation omitted.) *Holmes v. State*, 275 Ga. 853, 854 (3) (572 SE2d 569) (2002). Accord *Bryant v. State*, 246 Ga. App. 711, 713 (2) (541 SE2d 80) (2000).

[22] See OCGA § 24-2-2: "The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct."