**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 26, 2013**

# In the Court of Appeals of Georgia

A13A0014. RAYMOND v. THE STATE.

MILLER, Judge.

James Raymond, convicted by a jury of 21 counts of theft by taking (OCGA § 16-8-2), appeals from the trial court's denial of his motion for new trial, contending the following: the evidence was insufficient to sustain his convictions; the trial court improperly admitted voluminous records of Western Union and MoneyGram as business records; the trial court failed to impose penalties for discovery violations; and that his trial counsel rendered ineffective assistance. We discern no error and affirm.

1. Raymond argues that the evidence is insufficient to sustain his conviction. We disagree.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict and the defendant no longer enjoys a presumption of innocence. We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(Citation omitted.) *Stepho v. State*, 312 Ga. App. 495, 496 (718 SE2d 852) (2011).

So viewed, the evidence was that Raymond was the incorporator and president of Vision for Kids, Inc., d/b/a Caribbean Food Store (CFS), a small convenience store in Austell licensed to service Western Union and MoneyGram customers and to provide wire transfer of monies. On May 16, 2006, Raymond signed an agency agreement on behalf of CFS with Western Union for the purpose of wiring and receiving money via a Western Union terminal at CFS. A Western Union agent testified that someone wanting to send money would go to a Western Union location and fill out a to-send-money form including the recipient's name, the amount of money being sent, and other information. The clerk then typed that information into the Western Union terminal where it was stored in a database until the recipient went to the receiving location, completed a to-receive-money form including their name, address, phone number, the sender's name, amount expected, and the origin of the

2

money. The recipient was required to present a government issued photo identification to the Western Union agent.

"JAM" was the operator identification used by Raymond for Western Union transactions. The evidence showed that "JAM" was involved in 140 Western Union wire transfers for products or services that were not produced or rendered.

On December 4, 2007, Raymond's brother, Livingston Raymond, signed an agency agreement on behalf of CFS with MoneyGram, another company providing wiring and receiving of funds services through a terminal at CFS. To use MoneyGram, the sender would go to the agent's location, fill out a form, pay a fee, and the money would be transmitted to the designated individual. The recipient could go to any MoneyGram terminal in the United States and would need a reference number to obtain the money and would have to present identification if the amount were over $900.

The evidence showed that from January 28, 2008 through September 28, 2008, on 445 occasions, individuals wired funds through MoneyGram from all over the United States to different locations in Georgia and all of the funds were received at CFS by "JAMES," the MoneyGram operator identification for James Raymond.

Seventeen people who had wired money via MoneyGram and not received their purchase or service testified. All of the funds which they wired were received at CFS by "JAMES."

Erica Jackson of Eufaula, Alabama was looking on the internet for a loan in March 2008. Jackson was advised that she had been approved for a $25,000 loan, but would have to pay a fee. Jackson sent approximately $1,000 through MoneyGram on March 4th, but did not receive her loan or the return of her money.

Angela Morris of Hephzibah, Georgia also found a loan on the internet which she believed was through Principal Financial Group. On March 28, 2008, Morris sent $662 via MoneyGram to Cynthia Miller in New York City. Morris did not receive her loan or the return of her money.

In May 2008, Theresa Baxter of Hiram, Georgia was looking online for a vehicle. Baxter inquired about a Jeep Wrangler she found and was advised that the owner had received the Jeep in a divorce and wanted to sell it. Upon receipt of an "ebay motors" invoice, Baxter wired $3,650 to Edgard Doris in San Diego on May 1st. Baxter did not receive the car or her money back.

4

In order to pay for his daughter's surgery, Jeremy McCown of Gadsden, Alabama went online seeking a loan and, on May 1, 2008, he sent $845.75 to New York City through MoneyGram. McCown never received his loan nor did he get his money back.

In May 2008, Andrew Fountain of Acworth, Georgia found two jet skis for sale on Craigslist for $4,900. Fountain also received an email that appeared to be from ebay, directing him to send the money to a man in North Carolina. Fountain sent the $4,900 via MoneyGram on May 14, 2008, but did not receive the jet skis or his money back.

Leindy Godfrey of Dallas, Georgia located a truck on Craigslist that she wanted to get for her husband. After exchanging emails and receiving an emailed invoice from "ebay motors," on May 15, 2008, Godfrey sent $4,000 via MoneyGram to Robert Milford in San Jose, California. Godfrey did not receive the truck or her money back.

Justin Loriss of North Charleston, South Carolina located a BMW on Craigslist and, on May 17, 2008, he sent his payment of $10,000 through MoneyGram. Loriss did not receive the BMW or his money back.

5

Michael Eckhoff of Albertville, Alabama, was selling a truck and received a check in payment for it. The check, which he deposited into his account, included the cost of the truck plus shipping costs. In May 2008, Eckhoff, as instructed by the purchaser, sent $8,500 via three MoneyGrams to Georgia recipients. The check that Eckhoff had deposited in his account bounced for insufficient funds. Eckhoff did not receive any of his $8,500 back.

In June, 2008, Carnell Spurlock from Cocoa Beach, Florida, who left Louisiana after Hurricane Katrina, was looking online to replace his flooded out car. He found a car and contacted the seller, identified as Ashley McKeithen, who said she was recently divorced and was selling a Honda. Spurlock sent payments totaling $5,500 through MoneyGram to a Mat Stamper in New York. He did not receive the car or return of his money.

In June, 2008, Diana Fraden of Atlanta contacted a woman she located on a website to help obtain a loan to pay medical bills. The woman sent Fraden forms which Fraden filled out and faxed back. Fraden sent $500 via MoneyGram as her first payment for the loan to another person whose name the woman provided. Fraden did not get her loan nor did she receive her money back.

Meredith Metz, a student living in Alpharetta, found a listing for a Mercedes e500 for $5,000 on Craigslist in August 2008. According to the information provided, the seller, Alicia Taylor in Arizona, had just gone through a divorce and needed a family car, so she was selling the Mercedes at a discount. Metz wired $5,000 to Arizona on August 28th, but did not receive the car or the return of her money.

William E. Hodge of South Carolina was looking online for a loan and, on August 29, 2008, he sent $745 via MoneyGram as a fee, but he did not receive his loan or the return of his money.

In September 2008, Robert McCardel of Woodstock located a Honda Accord at a reasonable price on Craigslist. According to an e-mail received by McCardel, the seller was selling the car due to a recent divorce. McCardel wired $2,400 to Aaron McAllister , but did not receive the Honda or his money back.

Sherri Williams of Warner Robbins, Georgia located two Yorkies on petfinders.com that she wanted to purchase. She sent two MoneyGrams, one for $665 and then one for $380, but did not receive the dogs or her money back.

In September 2008, Jose Paz-Bascas sent $5,000 via MoneyGram to James Schram in Texas to purchase an automobile through ebay. He did not receive the automobile or his money back.

Having seen a Honda on Craigslist in which he was interested, Brandon Jass of Norwalk, Iowa sent $3,500 through MoneyGram to purchase it on September 20, 2008. He did not receive the Honda or his money back.

In September 2008, Shentago Reed of Albany, Georgia found a 2002 Ford F-150 on AutoTrader which was being sold due to a divorce. As directed, he sent $4,300 via MoneyGram for the truck. He did not receive the truck or his money back.

Raymond set up a bank account at North Georgia Bank on April 6, 2006 in the name of CFS and he was the only authorized signatory on the account. When the Western Union agency agreement was set up on May 16, 2006, this bank account was listed as the authorized account for this purpose. Deposit records for 2006 and 2007 showed that thousands of Western Union checks made out to different individuals were deposited into Raymond's account. Additionally, upon executing the search

8

warrant at CFS, officers found boxes of receipts for Western Union and MoneyGram transactions. All but a few of the documents found in these records had the customers' receipts still attached. A Cobb investigator located in these documents the receipts for the 63 complaints that had been received by her office of MoneyGram transfers where products or services were not received. Although the investigator attempted to locate the 63 people who were listed on the MoneyGrams as having received the money, she was unable to find any of them. Officers also seized numerous Western Union receipts. Numerous recipients were listed on the Western Union receipts as having picked up the funds and all were signed by Raymond as the agent.

When Raymond was arrested on September 26, 2008, he had two deposits prepared, one for $8,102 for a Wachovia account for South Cobb Package Store, at the same address as CFS, and one for $40,217 for a Wachovia account for CFS. Both deposits consisted of MoneyGram money orders made out to 30 other individuals.

On appeal, Raymond challenges the sufficiency of the evidence of the 21 counts of theft by taking. Counts 1 through 15 alleged theft by taking using MoneyGram from January through September 2008. Counts 16 through 21 of the

9

indictment alleged thefts from December 5, 2006 through September 14, 2007 using Western Union.

Although Raymond argues that the evidence was legally insufficient because there was no direct evidence that he used the computer terminals to process the transactions and other unnamed employees might have done it,[1] we disagree.

First, as set out above, there was substantial direct evidence of Raymond's involvement, not the least of which was the two large deposits of MoneyGrams found in his possession when he was arrested.

Further, "[t]he State is not required to remove every possibility of innocence of the crime charged, and it is not required to disprove bare possibilities that the crime could have been committed by someone else." (Citation omitted.) *Nangreave v. State*, 318 Ga. App. 437, 439 (1) (734 SE2d 203) (2012). Even if the proof were only circumstantial, "[w]hether the circumstances exclude every reasonable hypothesis except for [Raymond's] guilt was a question for the jury." (Citations omitted.) *Tauch v. State*, 305 Ga. App. 643, 645 (1) (700 SE2d 645) (2010) (evidence sufficient to support theft by taking where bank alarm activated at 2:20 a.m., defendant's truck

---

[1] The only authority cited in his argument is *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

10

was seen nearby earlier on surveillance video, responding officer found ATM was ripped out of wall and drug across parking lot, defendant's vehicle was capable of towing heavy equipment, and he fled from officers). Here, the evidence was legally sufficient to sustain Raymond's conviction on all counts.

2. In his second enumeration, Raymond argues that the trial court erred in allowing into evidence as business records State's Exhibit One - a spreadsheet of 140 fraud reports received by Western Union regarding CFS and State's Exhibit 44 - a MoneyGram spreadsheet of 445 received transactions at CFS. We disagree.

The trial court's decision to admit items into evidence will not be disturbed absent an abuse of discretion. See *Smith v. State*, 302 Ga. App. 128, 130 (1) (690 SE2d 449) (2010).

Pursuant to OCGA § 24-3-14 (b) and (c),

[a]ny writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event shall be admissible in evidence in proof of the act, transaction, occurrence, or event, if the trial judge shall find that it was made in the regular course of any business and that it was the regular course of such business to make the memorandum or record at the time of the act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker,

11

may be shown to affect its weight; but they shall not affect its admissibility.

(Punctuation omitted.)

(a) A Western Union representative testified that Exhibit One was a document created in the regular course of Western Union's business; that it was part of the ordinary course of Western Union's business to create such a document; and that she was familiar with the document. Upon its tender into evidence, Raymond's counsel stated "I object. He hasn't laid the proper foundation. *I could be more specific, but I don't believe I have to.*" (Emphasis supplied.)

Contrary to counsel's belief, it is necessary that an objection for lack of foundation specify the foundational element that is contended to be lacking. *Tolver v. State*, 269 Ga. 530, 532 (2) (500 SE2d 563) (1998); *Potter v. State*, 301 Ga. App. 411, 414-415 (2) (687 SE2d 653) (2009). That was not done here, and this issue is not preserved for appeal. *Tolver*, supra 269 Ga. at 532 (2).

(b) MoneyGram's representative testified that Exhibit 44 was a spreadsheet of transactional data generated by CFS's receipt of MoneyGram transmissions. The document was created in the ordinary course of MoneyGram's business and it was MoneyGram's ordinary course of business to generate such documents. The entries

were made as the transactions were generated. After defense counsel conducted voir dire of the MoneyGram witness regarding Exhibit 44, he stated "[d]o not object to No. 44." We concur with defense counsel that a proper foundation for admission of this document pursuant to OCGA § 24-3-14 (b) had been laid and the document was properly admitted. *Johnson v. State*, 266 Ga. 775, 776 (3) (470 SE2d 637) (1996); *Isbell v. Credit Nation Lending Svc.*, 319 Ga. App. 19, 23-24 (2) (a) (i) (735 SE2d 46) (2012). Also, we note that defense counsel's belated attempt to voice objection to Exhibit 44 later in the trial was ineffectual. *Horton v. State*, 269 Ga. 407, 410 (2) (604 SE2d 273) (2004) (failure to object to evidence at time of introduction waives error in admission).

3. Raymond's also contends that the trial court erred by not granting some remedy allowed under OCGA § 17-16-6 when the State presented evidence that was entered in violation of the discovery rules. We disagree.

As applicable here, OCGA § 17-16-4 (a) (3) (A) provides that

the prosecuting attorney shall, . . . , permit the defendant . . . to inspect and copy or photograph . . . papers, documents, . . . or copies or portions thereof . . . within the possession, custody, or control of the [S]tate or prosecution and are intended for use by the prosecuting attorney as evidence in the prosecution's case-in-chief or rebuttal at the trial or were obtained from or belong to the defendant.

13

When the State fails to comply with reciprocal discovery requirements, the trial court may "order the [S]tate to permit the discovery or inspection, . . . grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the [S]tate from introducing the evidence not disclosed." OCGA § 17-16-6.

During the trial, trial counsel became aware that the prosecution was going to introduce four boxes (Exhibits 50, 51, 52, 53) of documents which had been seized from CFS and Raymond pursuant to search warrants and which were not made available to him during discovery.

During the discussion of the discovery issue, the chief investigator testified that previous trial counsel for Raymond had examined the four boxes of evidence.[2] Trial counsel stated that he believed the failure to produce these four boxes of documents for his personal review was inadvertent, not wilful. Trial counsel also stated that he had been to the district attorney's office on two occasions and had seen boxes of Western Union and MoneyGram documents which he spent hours reviewing.

The trial court concluded that, because Raymond's previous counsel had seen the four boxes, the State had complied with its discovery obligation. We agree.

---

[2] Trial counsel was the third attorney to represent Raymond.

14

Also, although trial counsel did not see the four boxes of documents seized from CFS prior to trial, trial counsel and an associate did have an hour and a half break during the trial when they were able to review the four boxes. Therefore, even assuming without deciding that a discovery violation occurred, trial counsel was given one of the remedies provided by OCGA § 17-16-6, a chance to review the documents. Therefore ,there is no reversible error.

4. Raymond contends that his trial counsel rendered ineffective assistance by failing to timely object to State's Exhibit 44 and in failing to request a continuance upon discovering an abuse of reciprocal discovery. We disagree.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. [See] *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach

15

a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.

(Citation and punctuation omitted.) *Davenport v. State*, 316 Ga. App. 234, 239 (3) (729 SE2d 442) (2012).

(a) As discussed in Division 2 (b), Exhibit 44 was properly admitted as a business record. Therefore, trial counsel's failure to object to it at the time of its introduction did not constitute deficient performance because failure to make a meritless hearsay objection cannot be evidence of ineffective assistance of counsel. *Williams v. State*, 289 Ga. 672, 674 (2) (715 SE2d 76) (2011).

(b) With regard to the discovery issue, as set out in Division 3, there was no discovery violation. Even assuming one occurred, trial counsel was provided the opportunity to review the documents during the trial. Despite trial counsel's testimony that he would have done additional investigation before trial had he seen the documents earlier, we conclude, as did the trial court, that trial counsel rendered reasonably effective assistance.

*Judgment affirmed. Barnes, P. J., and Ray, J., concur.*