RECEIVED IN
COURT OF CRIMINAL APPEALS

December 16, 2015

ABEL ACOSTA, CLERK

AP-77,043
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/15/2015 7:27:21 PM
Accepted 12/16/2015 7:48:38 AM
ABEL ACOSTA
CLERK

## NO. AP-77,043

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AT AUSTIN, TEXAS

_____

**THE STATE OF TEXAS,**
*Appellant,*
v.
**LARRY RAY SWEARINGEN,**
*Appellee.*

_____

*Arising from:*

**Cause No. 99-11-06435-CR**
IN THE DISTRICT COURT
FOR THE NINTH JUDICIAL DISTRICT
MONTGOMERY COUNTY, TEXAS

_____

**BRIEF OF FORENSIC SCIENTISTS AS *AMICI CURIAE*
IN SUPPORT OF MOTION FOR REHEARING**

_____

**Alfredo R. Pérez**
Tex. Bar No. 15776275
Weil, Gotshal & Manges LLP
700 Louisiana St., Suite 1700
Houston, TX 77002

**Ralph Miller**
Tex. Bar No. 14105800
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6850

*Counsel for Amici Curiae*

WEIL:\95541720\6\99995.5434

## Identities of Parties, Counsel, and *Amici Curiae*

| | |
|---|---|
| **District Attorney:** | **Brett W. Ligon**<br>District Attorney<br>Montgomery County, Texas<br>207 W. Phillips, Second Floor<br>Conroe, Texas 77301 |
| **Counsel for the State:** | **William J. Delmore III**<br>Assistant District Attorney<br>Montgomery County, Texas<br>207 W. Phillips, Second Floor<br>Conroe, Texas 77301 |
| **Appellee:** | **Larry Ray Swearingen** |
| **Counsel for Appellee:** | **James G. Rytting**<br>Hilder & Associates, P.C.<br>819 Lovett Boulevard<br>Houston, Texas 77006 |
| | **Bryce Benjet**<br>Tex. Bar. No. 24006829<br>The Innocence Project<br>40 Worth Street, Suite 701<br>New York, New York 10013 |
| **Counsel for *Amici Curiae:*** | **Alfredo R. Pérez**<br>Tex. Bar No. 15776275<br>Weil, Gotshal & Manges LLP<br>700 Louisiana St., Suite 1700<br>Houston, TX 77002 |
| | **Ralph Miller**<br>Tex. Bar No. 14105800<br>Weil, Gotshal & Manges LLP<br>200 Crescent Court, Suite 300<br>Dallas, TX 75201-6850 |

i

WEIL:\95541720\6\99995.5434

*Amici Curiae:*

**Greg Hampikian, Ph.D:** Dr. Hampikian is Professor of Biology at Boise State University, Idaho. He has been qualified as a DNA expert in Texas, and has worked on Forensic DNA cases across the United States and overseas. Dr. Hampikian is the author of numerous studies concerning human DNA testing (including a study of 194 exonerations), holds patents in forensic technology and has been involved in over a dozen DNA exonerations. He is Executive Director of the Idaho Innocence Project.

**Dan E. Krane, Ph.D:** Dr. Krane is a Professor in the Department of Biological Sciences at Wright State University in Dayton, Ohio, and recently served three consecutive terms as president of the faculty at Wright State. He has testified in more than 110 criminal cases in which DNA evidence was presented (in more than 20 different States as well as in Australia and in Belfast Crown Court and the Central Criminal Court of London) as an expert for both the prosecution and defense in the areas of population genetics, molecular biology, and bioinformatics. Dr. Krane is also the president and a co-founder of Forensic Bioinformatic Services, Inc., where he has overseen the development and implementation of software designed to automatically and objectively review STR DNA testing results. Two different governors of the Commonwealth of Virginia appointed him to Virginia's Scientific Advisory Committee—a panel of 12 experts that oversees policies and practices of Virginia's Department of Forensic Science—and in that capacity, he chaired Virginia's subcommittees on familial searching and Y-STR validation and testing protocols. Dr. Krane graduated with a Bachelor's degree for a double major in Biology and Chemistry from John Carroll University and a Ph.D. in Biochemistry from the Cell and Molecular Biology Department at the Pennsylvania State University. He has also done post-doctoral studies in the Genetics Department of Washington University's Medical School and in the Department of Organismic and Evolutionary Biology at Harvard University. He has published over fifty peer-reviewed papers, many of which are directly related to forensic DNA testing, particularly in the areas of using DNA profiles to generate investigative leads (i.e. familial searching) and increasing the objectivity and sensitivity of current DNA typing methodologies, and is the lead author of the best-selling undergraduate textbook in the field of bioinformatics.

**Joseph E. Warren, Ph.D:** Dr. Warren has been a faculty member at the University of North Texas Health Science Center since January of 2002 and has taught courses including Biological Evidence Examination, Overview of Forensic Science, Expert Witness Testimony in Forensic Science, Molecular Methods in

WEIL:\95541720\6\99995.5434

Forensic Genetics, Basic Laboratory Methods in Forensic Genetics and Bloodstain Pattern Analysis. Dr. Warren has been recognized as an expert in Forensic Biology, Forensic DNA Analysis, Bloodstain Pattern Analysis and Microscopic Hair and Fiber Analysis in courts in six states (Texas, Louisiana, Oklahoma, Mississippi, Delaware and Wisconsin), which included admissibility hearings for STR DNA analysis in Delaware and Louisiana and mitochondrial DNA analysis in Mississippi. He has testified on DNA policy before the Louisiana State Legislature. His research include DNA damage and repair and its application to forensic analysis, PCR Inhibition, DNA analysis of skeletal remains, mitochondrial DNA mutation and variation, Y-STR analysis, forensic DNA validation and bloodstain pattern analysis and interpretation. His prior work experience includes working as a case consultant for Genescreen, Inc. in Dallas, Texas from 2001 to 2002, where he ran the mitochondrial DNA test section of their forensic laboratory, initiated research and development in Y chromosome STR analysis, and assisted the Director of Operations and the Technical Leader in receiving ASCLD accreditation in 2001; as Director of the Forensic Laboratory at ReliaGene Technologies, Inc. from 1999 to 2001; in the Tarrant County Medical Examiners' Office in fort Worth, Texas from 1990 to 1999; and as Chief Forensic Molecular Biologist for a private DNA testing laboratory from 1988 to 1990. Dr. Warren received his BS and MS degrees in Biology from Tulane University in New Orleans, LA and his PhD. in Molecular Biology from the University of North Texas in Denton, TX.

**Rhonda C. Williams, Ph.D:** Dr. Williams is a CODIS Analyst and Criminalist III on the Crime Scene Team at the Oklahoma State Bureau of Investigation, and adjunct faculty in the Forensics and Biology programs of the University of Central Oklahoma. She previously worked at the Harris County Institute of Forensic Sciences ("HCIFS") in Houston, Texas from May 2006 to June 2014, including as Team Leader of HCIFS's Trace Evidence Collection Team from 2011 to June 2014, and as a DNA Analyst II. She was adjunct faculty in the Pathology Department of the Baylor College of Medicine in Houston, Texas between 2007 and 2014. Dr. Williams has testified in numerous trials as a DNA expert, has provided DNA collection and preservation training for law enforcement and medical examiners, and has authored numerous papers on DNA collection, preservation, and contamination. Dr. Williams has a Bachelor of Science in Biochemistry from the University of Oklahoma, and a Ph.D and a Master of Sciene in Biochemstry and Molecular Biology from the University of Oklahoma Health Sciences Center.

WEIL:\95541720\6\99995.5434

**Arthur Young:** Mr. Young is a forensic biology specialist with 24 years of experience at the bench. His expertise includes forensic serology and DNA analysis, as well as obtaining results from unconventional sources. His career includes a decade in the public sector and a decade in the private sector, before launching his own forensic laboratory. He remains an active analyst, continuing to examine evidence, analyze samples, issue reports, and provide testimony, as well as conduct research."

WEIL:\95541720\6\99995.5434

# Table of Contents

STATEMENT OF INTEREST ............................................................................1

SUMMARY OF ARGUMENT .........................................................................1

ARGUMENT ................................................................................................4

I.     Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Use of DNA Testing Technology Today .........................4

II.    Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Use of DNA Database Comparisons Today ...................11

III.   Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Today's View of DNA Testing and Database Comparisons as More Reliable than Many Other Forms of Evidence ................................15

CONCLUSION .........................................................................................17

WEIL:\95541720\6\99995.5434

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex parte Arledge*,
    No. 21,693 (13th Dist. Ct., Navarro County, Tex. Feb. 11, 2013).....................14

*Illinois v. Thames,*
    Case No. 95-CR-9676 (Ill. Cir. Ct. Cook Cnty. Nov. 16, 2011),
    http://www.lb7.uscourts.gov/documents/12c9170.pdf..................................5, 14

*Ex parte Jackson*,
    366 S.W.3d 201 (Tex. Crim. App. 2012) .......................................................5, 14

*Jackson v. Day,*
    1997 WL 450202 (5th Cir. July 16, 1997) .........................................................16

*Maryland v. King*,
    133 S. Ct. 1958 (2013)........................................................................................13

*Ex parte Morton*,
    2011 WL 4827841 (Tex. App. Crim. Oct. 12, 2011) .........................................14

*Pennsylvania v. Yarris*,
    No. 690-OF1982 (Pa. Ct. Com. Pl. Del. Cnty. Sept. 3, 2003)............................5

*Vaughn v. State*,
    646 S.E.2d 212 (Ga. 2007) ...................................................................................8

*Ex parte Wallis*,
    2007 WL 57969 (Tex. Crim. App. Jan. 10, 2007)................................................7

*Ex parte Williams*,
    No. AO-76,820 (Tex. Crim. App. June 20, 2012 ...............................................14

**Statutes & Rules**

Katie Sepich Enhanced DNA Collection Act of 2012, Pub. L. No. 112-253, 126
    Stat. 2407 ...........................................................................................................13

Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A) (West Supp. 2015) ............4, 15, 17

vi

Tex. Rules of Evid., Rule 702 (effective Apr. 1, 2015)..............................................4

**Other Authorities**

Byron Halsey, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/byron-halsey ...................................................................................6

Calvin Willis, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/calvin-willis ...................................................................................6

Cathy Woods, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/cathy-woods...................................................................................6

*CODIS—NDIS Statistics*, FBI, https://www.fbi.gov/about-us/lab/biometric-analysis/codis/ndis-statistics (last updated Oct. 2015) .......................................13

*DNA Arrestee Laws,* Nat'l Conf. of State Legislatures, http://www.ncsl.org/research/civil-and-criminal-justice/dna-arrestee-laws.aspx ..............................13

*DNA Exonerations Nationwide*, Innocence Project (Oct. 26, 2015), http://www.innocenceproject.org/free-innocent/improve-the-law/fact-sheets/dna-exonerations-nationwide...................................................................16

*DNA for the Defense Bar*, Nat'l Inst. of Justice, at 161 (June 2012), https://www.ncjrs.gov/pdffiles1/nij/237975.pdf.................................................17

DOJ, *Advancing Justice Through DNA Technology: Using DNA to Solve Crimes*, http://www.justice.gov/ag/advancing-justice-through-dna-technology-using-dna-solve-crimes ...................................................................................12, 14

DOJ, *FBI Laboratory 2007 Report*, https://www.fbi.gov/about-us/lab/lab-annual-report-2007 ..............................................................................................13

DOJ, *Post-Conviction DNA Testing: Recommendations for Handling Requests*, at xiii (Sept. 1999), https://www.ncjrs.gov/pdffiles1/nij/177626.pdf#page=66 ....12

DOJ, Press Release, Sept. 10, 2015, http://www.justice.gov/opa/pr/vice-president-biden-and-attorney-general-lynch-announce-41-million-grant-initiative-address ................................................................................................8

DPS, *Best Practices for Collection, Packaging, Storage, Preservation, and Retrieval of Biological Evidence* (Oct. 30, 2012), https://www.txdps.state.tx.us/CrimeLaboratory/documents/labBP01BestPractice.pdf......................................6

WEIL:\95541720\6\99995.5434

DPS, *DNA Database Helping Texas Law Enforcement Solve Crimes* (Dec. 12, 2012), http://www.dps.texas.gov/director_staff/media_and_communications/ 2012/pr121212.htm .................................................................................14

DPS, *DNA Database Helping Texas Law Enforcement Solve Crimes* (May 4, 2005), https://www.dps.texas.gov/director_staff/public_information/2005/ pr050405.htm ....................................................................................14

*FAQs on the CODIS Program and the Nat'l DNA Index Sys.*, FBI, https://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet ....................................................................................8

Freda Solomon and David Hauser, *The Influence of CODIS DNA Testing on the Arrest and Prosecution of Burglary and Sexual Assault Cases in New York City: An Exploratory Study*, N.Y.C. Criminal Justice Agency, Inc. (June 2011).......................................................................................12

*Hair*, Minn. Bureau of Criminal Apprehension, https://dps.mn.gov/divisions/bca/bca-divisions/forensic-science/Pages/trace-hair.aspx ..........................................................................................8

Jerry Miller, Nw. Pritzker School of Law, http://www.law.northwestern.edu/legalclinic/wrongfulconvictions/ exonerations/il/jerry-miller.html...............................................................15

John Roman, et al., Urban Institute, *The DNA Field Experiment: Cost-Effectiveness Analysis of the Use of DNA in the Investigation of High Volume Crimes* (Apr. 2008) ..............................................................................10

Joseph Frey, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/joseph-frey .......................................................................5

Karl McDonald, *DNA Forensic Testing and Use of DNA Rape Kits in Cases of Rape and Sexual Assault*, Forensic Magazine (Jan. 26, 2015), http://www.forensicmag.com/articles/2015/01/dna-forensic-testing-and-use-dna-rape-kits-cases-rape-and-sexual-assault ...........................................7

Katherine Driessen and Mike Morris, *Rape Kit Backlog Yields 19 New Suspects*, Houston Chronicle, Oct. 16, 2014, http://www.houstonchronicle.com/news/ houston-texas/houston/article/Rape-kit-backlog-yields-19-new-suspects-5805359.php............................................................................................8

WEIL:\95541720\6\99995.5434

Larry Youngblood, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/larry-youngblood .................................................................5

Maurice Possley, *Christopher Ochoa,* Nat'l Registry of Exonerations (June 2012), http://www.law.umich.edu/special/exoneration/pages/casedetail.aspx? caseid=3511 ...............................................................................................16

Rhonda Williams and Roger Kahn, *Forensic DNA Collection at Death Scenes: A Pictoral Guide* (2014) ................................................................................9

ix

## STATEMENT OF INTEREST

*Amici curiae* are forensic scientists who respectfully submit this brief to provide a scientific and investigatory perspective on DNA testing. *Amici curiae* have no interest in any party to this litigation, nor any stake in the outcome of this case.

## SUMMARY OF ARGUMENT

This Court's analysis of post-conviction "exculpatory results" articulated in the Majority Opinion delivered in this case on October 28, 2015 should be updated to be consistent with the DNA testing that the *Amici* regularly perform in their professional practices today on evidence collected in criminal investigations, and the results they obtain from that DNA testing. The standard this Court cited in footnote 17 of the Majority Opinion, repeating a standard from 2007, restricts the evidence that may be considered for "exculpatory results" by limiting it to that which excludes the convicted person. *Amici* believe that this standard focuses on outdated notions of DNA testing results, and that any standard applied today must take into account the advancements of science since 2007 and consider all realistically possible results.

The Majority's standard places irrational limitations on access to DNA testing. It fails to take into account the enhanced ability of current technology to identify the specific source of DNA and the impact of evaluating

1

WEIL:\95541720\6\99995.5434

collective results from testing multiple pieces of evidence for DNA. It also significantly limits consideration of the types of evidence for which DNA testing is highly effective and commonly used today, including rape kits, blood evidence, and trace evidence. While the Majority's focus on only exclusionary test results may have been consistent with the use of DNA testing a decade ago, the standard today for "exculpatory results" should reflect current best practices for forensic scientists. These include testing a wide variety of crime scene trace evidence, blood, and semen because of the heightened sensitivity of today's DNA testing technology, and comparing DNA profiles against known suspects and offenders in DNA databases, such as the FBI's Combined DNA Index System database ("CODIS").

The science of forensic DNA testing has advanced substantially in recent years, and these advancements have changed both the way DNA testing is used in the criminal justice system and the emphasis placed on DNA evidence over other types of evidence. These advancements make it possible to obtain useful DNA results that can conclusively inculpate or exculpate an individual from evidence that, even in the recent past, would have been considered inappropriate for testing by forensic investigators, law enforcement personnel, prosecutors, defense attorneys, judges, and juries. This includes testing previously untested rape kits for DNA; hair evidence for mitochondrial DNA; and items such as

2

ligatures, the victim's clothing, fingernail scrapings, and cigarette butts, for trace evidence. It also includes considering those test results collectively. Further, comparison of DNA profiles from crime scenes against CODIS is now widely recognized as a critical tool in investigations, including in Texas, and its use in criminal cases has expanded exponentially as a result.

It is important to recognize that, as a matter of forensic science, the way current DNA testing and database comparison is used (and the nature of the results obtained) is the same, regardless of whether the testing is done in a new criminal investigation or in the post-conviction context. Just as forensic DNA testing has been used with great success to solve cold cases through the identification of a known suspect or obtaining a hit in CODIS, the same exculpatory results can and have been obtained in post-conviction cases to prove innocence. Therefore, the standard for exculpatory results from post-conviction DNA testing should accurately reflect how forensic scientists use DNA testing and databases in practice.

The broader access to post-conviction DNA testing that may result from an updated standard for exculpatory post-conviction DNA results will not negatively impact the criminal justice system. DNA testing has not been shown to create a risk of exonerating those who are guilty. Further, guilty persons are inherently unlikely to make frivolous requests for testing that would confirm their

3

guilt. Concerns regarding contamination of older evidence or the potential for other misleading results are not unique to the post-conviction context; they can be accounted for in the same way courts consider such results in cold case prosecutions and through the gateway screening provisions of Texas Rule of Evidence 702.

In recent years, post-conviction DNA testing has proven the innocence of hundreds of wrongfully convicted men and women, and CODIS has frequently identified the actual perpetrators of the crime. These cases used more advanced DNA testing than had been available at the time of the conviction, and in some instances, at the time of prior post-conviction testing. Thus, interpreting the concept of "exclusionary results" in Chapter 64 of the Texas Code of Criminal Procedure in a manner consistent with real-world use of DNA testing technology and databases by forensic scientists today will further the laudable goals of convicting the guilty while protecting the innocent.

## ARGUMENT

I. **Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Use of DNA Testing Technology Today**

The capability of DNA testing to produce "exculpatory results," even in the presence of competing circumstantial evidence to the contrary, has advanced significantly in almost all aspects of DNA analysis, in recent years. The technology is more sensitive, and also less costly and more readily available to

4

conventional forensic laboratories, which allow for more accurate, rapid and readily available results from DNA testing for a larger number of legal proceedings and criminal cases. This has led to dramatic changes in the application of DNA testing to criminal cases. Numerous cases evidence the effectiveness of these advances in DNA testing technology. They show that the standard for whether to allow post-conviction DNA testing must take into account the current state of forensic science, and reflect advances and updated practices because of their proven ability to both exonerate and convict.[1]

The best practices that forensic scientists now follow in testing for DNA evidence in a variety of crimes are the result of both improvements in technology and the determination that the results from such testing is accurate and a critical tool in solving crimes, whether new or old. Specifically, the Texas

---

[1] For example, four men convicted of a 1994 rape and murder, each based on their own confessions or guilty pleas, filed a motion for more advanced DNA testing than was conducted before trial. The new STR-DNA testing, done in 2010, excluded all four defendants while identifying another offender through CODIS. Charges against all four defendants were vacated. *Illinois v. Thames,* Case No. 95-CR-9676 (Ill. Cir. Ct. Cook Cnty. Nov. 16, 2011) http://www.lb7.uscourts.gov/documents/12c9170.pdf; *see also Pennsylvania v. Yarris*, No. 690-OF1982 (Pa. Ct. Com. Pl. Del. Cnty. Sept. 3, 2003) (order vacating the 1982 conviction of Yarris, who was sentenced to death for murder, rape, and abduction, even though successive rounds of post-conviction DNA testing were inconclusive, because PCR-enhanced DNA testing performed in 2003 on gloves, fingernail scrapings, and sperm excluded Yarris); Larry Youngblood, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/larry-youngblood (degraded evidence tested with newer scientific techniques exonerated Youngblood and led to conviction of actual perpetrator); Joseph Frey, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/joseph-frey (post-conviction STR-DNA testing showed DNA from a convicted sex offender and exonerated Frey); *Ex parte Jackson*, 366 S.W.3d 201 (Tex. Crim. App. 2012) (original scientific testimony supported a match between semen from a rape kit and Jackson, but post-conviction DNA analysis excluded Jackson and a CODIS search identified two incarcerated offenders who admitted to the crime).

5

Department of Public Safety's ("DPS") best practices for forensic scientists now include collection of items including rape kits, hair, fingernail scrapings, ligatures, clothing, and cigarette butts, because of the recognition that these items can contain the DNA evidence that establishes the identity of the person who committed the offense.[2] These best practices are supported by numerous cases, including at post-conviction, that relied on testing the types of evidence that exist in this case, including rape kits, hairs, ligatures, fingernail scrapings, clothing, and cigarette butts.[3]

DNA testing is particularly probative where multiple pieces of evidence exist that can be tested for DNA. Though the absence of evidence cannot be taken as proof of absence, the failure to detect the suspect's DNA on any evidence collected from crime scenes can constitute "exculpatory results" that can overcome strong circumstantial evidence due to the extreme sensitivity of today's DNA tests. Similarly, the discovery of a third party's DNA on multiple pieces of

---

[2] DPS, *Best Practices for Collection, Packaging, Storage, Preservation, and Retrieval of Biological Evidence* (Oct. 30, 2012), https://www.txdps.state.tx.us/CrimeLaboratory/documents/labBP01BestPractice.pdf.

[3] *E.g.*, Cathy Woods, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/cathy-woods (post-conviction DNA testing on a cigarette butt that was not tested prior to trial exonerated Woods and identified a male profile that subsequently generated a CODIS hit); Calvin Willis, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/calvin-willis (post-conviction DNA testing on boxer shorts and fingernail scrapings found several DNA samples, including one male profile on both pieces of evidence, and exonerated Willis, who was excluded as a contributor); Byron Halsey, Innocence Project, http://www.innocenceproject.org/cases-false-imprisonment/byron-halsey (post-conviction DNA testing of cigarette butts near the crime scene exonerated Halsey and implicated a third party).

WEIL:\95541720\6\99995.5434

evidence can be exculpatory. *E.g.*, *Ex parte Wallis*, 2007 WL 57969 (Tex. Crim. App. Jan. 10, 2007) (Wallis's 1989 conviction for burglary with intent to commit sexual assault was vacated after a second round of post-conviction DNA testing found one consistent DNA profile on the rape kit and cigarette butts). Evidence available for DNA testing must therefore be considered not only individually but also collectively when determining its potential for "exculpatory results."

In this case, there are several items that would routinely be tested for DNA evidence that can, taken together, exculpate or inculpate a suspect, where they would not have been tested in the recent past. For example, the rape kit in this case has not been tested for DNA evidence. But technological improvements have made it possible to find DNA evidence where it was previously impossible, including the ability to test for non-sperm DNA in addition to sperm DNA, and the greater sensitivity in DNA testing that makes it possible to test for minute amounts of semen that were previously undetectable.[4] The recent focus nationwide and in Texas on testing rape kits, and funding that testing, shows that today, it is widely accepted that rape kits should be tested because the results assist in convicting the

---

[4] *E.g.*, Karl McDonald, *DNA Forensic Testing and Use of DNA Rape Kits in Cases of Rape and Sexual Assault*, Forensic Magazine (Jan. 26, 2015), http://www.forensicmag.com/articles/2015/01/dna-forensic-testing-and-use-dna-rape-kits-cases-rape-and-sexual-assault (noting DNA samples from rape kits can now be tested for alternative genetic evidence, such as saliva samples).

7

guilty and potentially preventing future crimes.[5]  In Texas, the Houston Police

Department recently eliminated its backlog of rape kits, which had gone untested

for up to 30 years, while the Texas legislature appropriated $5 million in 2015 to

assist with testing the entire state's backlog of rape kits.[6]

Similarly, DNA testing of hair evidence has improved.  For example,

hair can now be tested for DNA even if it has no root by using mitochondrial DNA

testing, which excludes the vast majority of individuals as the source of the hair.

*E.g.*, *Hair*, Minn. Bureau of Criminal Apprehension,

https://dps.mn.gov/divisions/bca/bca-divisions/forensic-science/Pages/trace-

hair.aspx (hair that has no root can be sent for mitochondrial DNA testing); *FAQs*

*on the CODIS Program and the Nat'l DNA Index Sys.*, FBI,

https://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-

sheet (mitochondrial DNA can be submitted to CODIS); *Vaughn v. State*, 646

S.E.2d 212, 214 (Ga. 2007) (mitochondrial DNA analysis "is more applicable for

exclusionary, rather than identification, purposes").

---

[5] DOJ, Press Release, Sept. 10, 2015, http://www.justice.gov/opa/pr/vice-president-biden-and-attorney-general-lynch-announce-41-million-grant-initiative-address (announcing $41 million in grant awards to reduce number of untested sexual assault kits nationwide because up to 50% of previously unsolved rapes are solved through these untested kits and bringing the rapists to justice gets them off the streets).

[6] Katherine Driessen and Mike Morris, *Rape Kit Backlog Yields 19 New Suspects*, Houston Chronicle, Oct. 16, 2014, *http://www.houstonchronicle.com/news/houston-texas/houston/article/Rape-kit-backlog-yields-19-new-suspects-5805359.php* (noting Houston had nearly completed testing backlogged DNA samples from 9,750 cases, including 6,600 rape kits dating back to 1987, and DNA from 1,031 of those cases had produced CODIS hits).

8

Finally, testing trace DNA samples (which are samples that fall below recommended thresholds at any stage of the scientific analysis) gathered from non-biological materials is a recent phenomenon that today may be used in both pre- and post-conviction testing, including homicide, sexual assault, and property crime cases in Texas. Within the last decade, trace DNA testing has become much more sensitive, while its cost has significantly decreased. Trace DNA testing is now routinely attempted on practically any item handled or used or left by the perpetrator of a crime.[7] Studies done in 2007 and 2008 show that testing trace DNA testing more broadly, beyond the most violent crimes, is effective and can be more reliable than non-DNA investigative tools. The Harris County (Houston, Texas) Institute of Forensic Sciences ("HCIFS") began testing large numbers of trace DNA samples from property crimes in 2007 as an experiment. After the HCIFS found that testing trace DNA samples from property crimes frequently provided nearly a full profile against individuals in CODIS, investigators increasingly began to collect and submit trace DNA evidence. Today, the HCIFS has an accredited Trace DNA Evidence Collection Team, which focuses specifically on collecting trace DNA in all rape, homicide, and property crime cases. Rhonda Williams and Roger Kahn, *Forensic DNA Collection at Death*

---

[7] For example, current STR typing, miniSTR and Y-STR DNA testing now make it possible to acquire and test DNA from incredibly minute samples of biological materials, including transferred skin cells, traces of saliva, and cells contained in sweat.

9

*Scenes: A Pictoral Guide*, at 1-2 (2014); *also* John Roman, et al., Urban Institute, *The DNA Field Experiment: Cost-Effectiveness Analysis of the Use of DNA in the Investigation of High Volume Crimes*, at 153-54 (Apr. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/222318.pdf (2008 study concluding that trace DNA testing is effective in solving property crimes and homicide, and can be more effective and reliable than other investigative tools, including fingerprinting, eyewitness testimony, and impression evidence). The nonbiological evidence that exists in this case—ligatures, fingernail scrapings, cigarette butts, and victim's clothing—would now be tested in Harris County and elsewhere as a matter of course for trace DNA because forensic scientists expect to find trace biological evidence on them, whereas in the past, these items would only have been checked for obvious blood or semen stains.

Thus, the standard for "exculpatory results" should reflect forensic scientists' current best practices in determining what evidence should be tested for DNA, and recognize that the collective results from that evidence is probative in conclusively determining guilt or innocence, rather than allowing a standard for only new and cold cases that reflects those best practices, while relegating post-conviction cases to a standard that is consistent with DNA testing practices from a decade ago.

10

## II. Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Use of DNA Database Comparisons Today

Comparison of DNA profiles from sources of evidence collected from a crime scene to an individual in DNA databases such as CODIS should be considered by this Court in determining whether inculpatory evidence can be overcome through DNA testing. The existence of CODIS has dramatically increased the usefulness of DNA testing by providing a source against which DNA evidence can be compared even in cases where there is no known suspect. CODIS is a major reason why DNA testing has gained the acceptance it now enjoys, and the effectiveness of comparing DNA evidence against CODIS expands not just to new investigations or unsolved cold cases, but to any legitimate criminal matter where it can provide the truth otherwise hidden, including post-conviction cases in which no, improper, or outdated DNA testing was done.

The principal purpose of DNA databases such as CODIS is to allow federal, state, or local criminal justice or law enforcement agencies to compare DNA profiles of offenders maintained in the system for the purpose of identification, arrest, and prosecution of individuals, or the exoneration of suspects. Due to advances in DNA testing technology, DNA databases have grown tremendously in recent years, and are now recognized as an effective and standard tool in the investigation and prosecution of crimes, as well as the exoneration of suspects. In the past, DNA testing was frequently considered only for its potential

11

value in showing exclusionary results that could exonerate a person because of technological limitations. Thus, a U.S. Department of Justice ("DOJ") report from 1999 discussed DNA testing only as a possible method for finding exclusionary results that would either exonerate a petitioner or support his claim of innocence. DOJ, *Post-Conviction DNA Testing: Recommendations for Handling Requests*, at xiii (Sept. 1999), https://www.ncjrs.gov/pdffiles1/nij/177626.pdf#page=66.

In comparison, today, DNA testing is generally used to solve crimes by comparing the DNA at a crime scene to both the DNA of an individual suspect and to profiles in DNA databases like CODIS.[8] CODIS hits are now widely accepted and commonly used for comparisons not just to the specific case at hand, but to connect arrestees to past crimes. A match to a DNA profile in CODIS influences the outcomes in criminal justice cases.[9]

Recognizing the persuasiveness of a match in CODIS to DNA from a crime scene as evidence, and its effectiveness in leading to convictions and exonerations, state and federal agencies have worked in recent years to expand

---

[8] DOJ, *Advancing Justice Through DNA Technology: Using DNA to Solve Crimes*, http://www.justice.gov/ag/advancing-justice-through-dna-technology-using-dna-solve-crimes.

[9] *E.g.*, Freda Solomon and David Hauser, *The Influence of CODIS DNA Testing on the Arrest and Prosecution of Burglary and Sexual Assault Cases in New York City: An Exploratory Study*, N.Y.C. Criminal Justice Agency, Inc., at 7, 11-12, 34-36, 47 (June 2011) (determining based on a 2008 review of DNA testing of evidence from burglary and sexual assault cases that a CODIS match was found in 54.6% of those cases, and that a match in CODIS can influence arrest and conviction rates, and the likelihood of charge severity depreciation in those cases).

12

CODIS and clear backlogs of DNA testing. The CODIS database itself also has expanded dramatically in recent years, resulting in a corresponding increase in the number of CODIS hits obtained. In the 12 years between its inception in 1995 and 2007, the FBI reported that CODIS had collected approximately 5.3 million offender profiles and 200,000 forensic profiles, and had produced approximately 62,000 hits.[10] In comparison, as of September 2015, the FBI reported that CODIS contained nearly 12 million offender profiles, over 2.1 million arrestee profiles,[11] and over 650,000 forensic profiles, and had produced nearly 300,000 hits.[12]

Texas itself now recognizes the increasing importance of CODIS as an investigatory and evidentiary tool. In December 2012, the Texas DPS, which is the administrator for CODIS in Texas, reached its 10,000[th] offender cold hit (*i.e.*, unexpected DNA matches that help solve open cases), with 9,000 of those hits occurring in the last five years, versus only 1,000 cold hits occurring in the

---

[10] DOJ, *FBI Laboratory 2007 Report*, at 17, https://www.fbi.gov/about-us/lab/lab-annual-report-2007.

[11] Because of CODIS's effectiveness as an investigatory and evidentiary tool, DNA profiles taken from arrestees prior to conviction, which the FBI did not categorize in 2007, are now entered into and tracked in CODIS. The U.S. Supreme Court ruled collection of these DNA profiles constitutional in 2013. *Maryland v. King*, 133 S. Ct. 1958 (2013). Currently, 29 states, the federal government, the Department of Defense, and Puerto Rico upload DNA profiles of various categories of arrestees. *E.g.*, *DNA Arrestee Laws*, Nat'l Conf. of State Legislatures, http://www.ncsl.org/research/civil-and-criminal-justice/dna-arrestee-laws.aspx (listing states with laws for collection of DNA prior to conviction, including Texas); Katie Sepich Enhanced DNA Collection Act of 2012, Pub. L. No. 112-253, 126 Stat. 2407 (implemented in 2012 to provide grants to states to implement DNA arrestee collection processes).

[12] *CODIS—NDIS Statistics*, FBI, https://www.fbi.gov/about-us/lab/biometric-analysis/codis/ndis-statistics (last updated Oct. 2015).

13

preceding 11 years.[13]  Additionally, as of December 2012, the Texas DPS had uploaded over 660,000 offender DNA samples into the Texas portion of CODIS, versus only approximately 180,000 offender DNA profiles in 2004.[14]

As the DOJ has recognized, there is no difference in the effectiveness of a CODIS match as evidence, whether used against DNA evidence tested before or after conviction.[15]  Numerous post-conviction DNA testing exonerations have resulted in CODIS matches, which act as exculpatory evidence, including in several recent cases in Texas.[16]

---

[13] DPS, *DNA Database Helping Texas Law Enforcement Solve Crimes* (Dec. 12, 2012), http://www.dps.texas.gov/director_staff/media_and_communications/2012/pr121212.htm.

[14] DPS, DNA Database Helping Texas Law Enforcement Solve Crimes (Dec. 12, 2012), http://www.dps.texas.gov/director_staff/media_and_communications/2012/pr121212.htm; DPS, DNA Database Helping Texas Law Enforcement Solve Crimes (May 4, 2005), https://www.dps.texas.gov/director_staff/public_information/2005/pr050405.htm.

[15] DOJ, *Advancing Justice Through DNA Technology: Using DNA to Solve Crimes*, http://www.justice.gov/ag/advancing-justice-through-dna-technology-using-dna-solve-crimes (advocating use of post-conviction DNA testing, and citing in support two cases in which post-conviction testing matched other individuals in CODIS and exonerated original defendants).

[16] *E.g.*, *Ex parte Williams*, No. AO-76,820 (Tex. Crim. App. June 20, 2012), http://tx.findacase.com/research/wfrmDocViewer.aspx/xq/fac.20120620_0004721.TX.htm/qx (Williams was convicted of aggravated sexual assault in 1985 but this Court set his conviction aside in 2012 when updated testing excluded Williams and matched a CODIS profile); *Ex parte Morton*, 2011 WL 4827841 (Tex. App. Crim. Oct. 12, 2011) (Morton was convicted of murder in 1988 and a first round of post-conviction DNA testing was inconclusive, but this Court set Morton's conviction aside after another round of post-conviction testing in 2011 of a bandana and hair from the bandana revealed third party DNA that resulted in a CODIS hit); *Ex parte Arledge*, No. 21,693 (13th Dist. Ct., Navarro County, Tex. Feb. 11, 2013) (Arledge was exonerated after post-conviction DNA testing excluded Arledge and matched a CODIS profile); *Ex parte Jackson*, 366 S.W.3d 201 (Tex. Crim. App. 2012) (original scientific testimony supported a match between semen from a rape kit and Jackson, but post-conviction DNA analysis excluded Jackson and matched CODIS profiles of two currently incarcerated offenders who admitted to the crime); *Illinois v. Thames*, No. 95-CR-9676 (Ill. Cir. Ct. Cook Cnty. Nov.

14

Thus, the standard for post-conviction testing of DNA should recognize that comparison of DNA results to CODIS is a common practice today and that the potentially exculpatory or inculpatory effects of a CODIS hit must be considered in determining whether to allow post-conviction DNA testing.

## III. Standards for When to Allow Post-Conviction DNA Testing Should Be Consistent with Today's View of DNA Testing and Database Comparisons as More Reliable than Many Other Forms of Evidence

The standards for whether to allow DNA testing must recognize that evidence from DNA testing and database comparison is widely recognized today as accurate and reliable, and can overcome other sources of evidence that are otherwise perceived to provide "overwhelming" indication of guilt, including confessions, guilty pleas, incriminating statements, eyewitness testimony, and possession of crime scene evidence. Thus, in considering whether to allow DNA testing in post-conviction cases under Chapter 64, this Court should consider whether no or outdated DNA testing has occurred with respect to the evidence requested to be tested.

DNA testing and database comparisons are now commonly used at the early stages of investigation of a crime and in unsolved cold cases precisely because DNA evidence is considered more accurate and reliable than other forms

---

16, 2011) (described *supra* p.5, n.1); Jerry Miller, Nw. Pritzker School of Law, http://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/il/jerry-miller.html (post-conviction DNA testing excluded Miller and matched the CODIS profile of the perpetrator, a serial rapist).

of evidence. Similarly, DNA testing and database comparison evidence is even more compelling than other evidence in its ability to overcome (or confirm) a conviction, and is therefore a useful tool at the post-conviction stage.[17] Moreover, while contamination may be a concern in post-conviction cases, this concern always exists, and is no different whether in a new case, cold case, or post-conviction case.

In particular, as DNA testing evidence and DNA database comparisons have become more prevalent in recent years, such DNA evidence is now considered more accurate and reliable than guilty pleas or incriminating statements, eyewitness testimony, and possession of crime scene evidence, and should therefore be considered in post-conviction cases such as the present case, even if some of the individual's actions may be seen as incriminating. For example, in approximately 25 percent of DNA exoneration cases, the defendants had pled guilty, confessed to the crime, or made other incriminating statements.[18]

---

[17] In 1997, the Fifth Circuit reversed a district court's grant of habeas petition to Willie Jackson for a 1986 sexual assault for which Jackson's brother had confessed in court to the crime. Jackson was exonerated in 2006, after DNA testing ordered in his case conclusively linked his brother, who was serving a life sentence for another later rape, to the crime. *Jackson v. Day,* 1997 WL 450202 (5th Cir. July 16, 1997); *see also DNA Exonerations Nationwide*, Innocence Project (Oct. 26, 2015), http://www.innocenceproject.org/free-innocent/improve-the-law/fact-sheets/dna-exonerations-nationwide (compiling over 300 post-conviction exonerations nationwide based on DNA evidence).

[18] For example, Christopher Ochoa confessed to a 1998 rape and murder, provided details of the crime not available publicly, pled guilty, and testified regarding those details at the trial of his alleged coconspirator. DNA evidence later exonerated both Ochoa and his coconspirator, and matched another man who confessed to the crime in 1998. Maurice Possley*, Christopher Ochoa,*

16

Thus, the standard this Court applies to Chapter 64 should reflect the best practices that forensic scientists now follow in testing DNA evidence and comparing results to DNA databases because those practices are based on the determination that those results can overcome what in the past may have appeared to be overwhelming inculpatory evidence from other sources, including eyewitness testimony placing an individual with the victim prior to the crime, possession of crime scene evidence, and the individual's own inculpatory actions that may appear to be an acknowledgement of guilt.

## CONCLUSION

Today, DNA testing and DNA databases are standard tools used by forensic scientists to assist in solving crimes and exonerating suspects. The ability to test biological evidence from rape kits and hair, and to test nonbiological evidence such as ligatures and cigarette butts for biological trace evidence, has improved significantly. Testing such evidence is now recognized as best practices in the field of forensic science due to the greater effectiveness of DNA testing and database comparison. These practices exist because all parties involved in the investigation and prosecution of crimes recognized that today, DNA testing and

---

Nat'l Registry of Exonerations (June 2012), *http://www.law.umich.edu/special/exoneration/pages/casedetail.aspx?caseid=3511*; *e.g.*, *DNA for the Defense Bar*, Nat'l Inst. of Justice, at 161 (June 2012) https://www.ncjrs.gov/pdffiles1/nij/237975.pdf (describing cases where DNA evidence exonerated individuals who had confessed to crimes).

17

database comparison results can conclusively inculpate or exculpate individuals.

The statutory definition given to "exculpatory results" cannot stand still in time, nor should advancements in forensic science be circumscribed to new crimes and cold cases. DNA testing and databases have proven to be effective in exculpating individuals in the post-conviction context as well, and can overcome otherwise overwhelming inculpatory evidence. The seven items of evidence at issue in the present case would, without question, be tested for DNA and compared against databases as a matter of course in new capital punishment cases in Texas today because they would likely yield probative evidence of the identity of the actual perpetrator.

WEIL:\95541720\6\99995.5434

Dated:  December 15, 2015

Respectfully submitted,

 /s/ Alfredo R. Pérez

**Alfredo R. Pérez**
Tex. Bar No. 15776275
Weil, Gotshal & Manges LLP
700 Louisiana St., Suite 1700,
Houston, TX 77002

**Ralph Miller**
Tex. Bar No. 14105800
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6850

*Counsel for Amici Curiae*

19

WEIL:\95541720\6\99995.5434