## S06A0070. QUEDENS v. THE STATE.
### (629 SE2d 197)

BENHAM, Justice.

Connie King Quedens appeals the judgment of conviction entered against her on the jury's verdict finding her guilty of the malice murder of Willie "Fred" Wilkerson and possession of a firearm during the commission of a crime. After examining the record and transcript in light of her enumerated errors and finding no reversible error, we affirm the judgment of conviction.[1]

Human skeletal remains were found in 2003 under 20 feet of debris in a filled well located approximately 100 yards from appellant's home on the Troup County property she owned. The remains were found in the remnants of a pair of pants with lip balm in the pocket and were wrapped, along with a corroded piece of pipe and a hacksaw blade, in a piece of carpeting that had extensive burn marks on it. Dentures were found in the well at or below the level where the skeletal remains were found.

The children of Fred Wilkerson, the man who had built the home in which appellant was living, who had been romantically involved with appellant in 1986-87, and who had not been seen or heard from since November 27, 1987, testified their father wore pants of the size found with the remains, wore dentures, and always carried a tube of the brand of lip balm found with the remains. A mitochondrial DNA[2]

---

[1] The victim was last seen on November 27, 1987, and his remains were found on September 30, 2003. Appellant was arrested on September 30, 2003, and a Troup County grand jury returned a true bill of indictment on November 3, 2003, charging her with murder, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon (two counts). Appellant's bifurcated trial commenced November 1, 2004, and concluded three days later with the jury's return of its verdicts finding appellant guilty of murder and possession of a firearm during the commission of a crime. The charges of possession of a firearm by a convicted felon were nol prossed. Appellant was sentenced on November 4, 2004, to life imprisonment for the murder conviction and a five-year term of years to be served consecutively for the conviction for possession of a firearm. She filed a timely notice of appeal on December 1, 2004, and the case was docketed in this Court on September 12, 2005. It was submitted for decision on the briefs.

[2] Mitochondrial DNA (mtDNA) compares genetic material in the mitochondria, which is inherited only from the female parent. Accordingly, "each child of a particular woman will share

comparison of one of the bones recovered from the well and an oral swabbing from the daughter of the missing man's sister led an expert in DNA analysis to conclude that Wilkerson could not be excluded as being the contributor of the bone sample since the sample had the same maternal lineage as the oral swabbing from Wilkerson's niece. Wilkerson's daughter testified she was not aware of any relative other than her father who was missing. A forensic anthropologist employed by the GBI testified the remains were those of a male and the skull contained an oblong defect consistent with having been shot in the back of the head. Based on all the factors, the expert opined that the remains were those of Fred Wilkerson.

Wilkerson's son testified his father and appellant were living together in the summer months of 1987 in the house his father had built, with the witness living in a basement apartment of the house. Wilkerson deeded his one-half interest in the property to appellant and, in early September 1987, the witness and his father were arrested on appellant's complaint and were required to leave the property. On November 25, 1987, Wilkerson filed a lawsuit against appellant in which he sought payment for the materials he had purchased and used to construct the home appellant was then sharing with her two sons and their father, whom she had divorced in August 1987. Wilkerson's son last saw his father the evening of November 27 in the apartment the two shared. Wilkerson's car, unlocked with the keys on the front seat and two uncashed payroll checks on the backseat, was located in a long-term parking lot at Atlanta's airport on December 24, 1987.

A woman who had been appellant's neighbor in 1987 testified appellant asked her to care for family pets during the 1987 Thanksgiving weekend because appellant, her former husband, and their two sons were going to Florida. On November 27, appellant called to

---

her mitochondrial DNA sequence, which will also be the same as all the mother's brothers and sisters, her mother and all other relatives along the maternal line." Victorian Institute of Forensic Medicine, www.vifm.org/identification_gov.html. See also Julian Adams, Nuclear and Mitochondrial DNA in the Courtroom, 13 J. Law & Policy 69 (2005).

> Compared with traditional nuclear DNA (nDNA) analysis, mtDNA offers three primary benefits. First, its structure and location in the cell make mtDNA more stable, enabling investigators to test old or degraded samples. Second, mtDNA is available in larger quantities per cell, enabling the testing of smaller samples. Finally, and most importantly, mtDNA can be extracted from samples in which nDNA cannot, specifically bone fragments and hair shafts.

Edward K. Cheng, Mitochondrial DNA: Emerging Legal Issues, 13 J. Law & Policy 99-100 (2005). MtDNA-testing was used to identify bodies found in mass graves in Bosnia and Haiti, bodies of members of the Romanov family, and victims of the September 11 attacks (id. at 102-103; Adams, supra, 13 J. Law & Policy at 70), and has been used to establish the identity of human skeletal remains in criminal proceedings. See, e.g., State v. Rogers, 188 SW3d 593, 2006 Tenn. LEXIS 123 (2006); Commonwealth v. Chmiel, 889 A2d 501 (Pa. 2005); Ware v. State, 348 Ark. 181 (75 SW3d 165) (2002).

cancel the pet care, saying her children and their father had left, but she was staying home alone "to protect her property." On November 28, appellant asked the neighbor's 19-year-old daughter to drive appellant's car to the Atlanta airport in order to provide appellant with transportation from the airport back to Troup County. Appellant said she had to drive an intoxicated friend to the airport in the friend's car, but the neighbor's daughter did not see appellant's friend or the friend's car during the trip to and from the Atlanta airport. A woman who worked with appellant in 1987 testified appellant told her on December 23, 1987, that appellant's boyfriend and house-building partner had left the home, leaving his car behind, when appellant had refused to give him her part of the house and property, and that she had noticed later the car was gone.

In 2003, law enforcement officers obtained a search warrant for appellant's home, including the filled well. During the execution of the search warrant, appellant told the officers she had not gone on the family Thanksgiving trip to Florida in 1987 because she had to work on Friday and Saturday of that week. When appellant was told about the witness who drove her from the Atlanta airport in 1987, appellant told the officers Wilkerson had come to her home at her invitation on November 27, 1987, to discuss settlement of his lawsuit against her; a marked police car had driven into appellant's driveway behind Wilkerson and a uniformed officer and a nurse had exited that vehicle; Wilkerson, the officer, and the nurse yelled at one another and then left in the police car; and appellant drove Wilkerson's car to the Atlanta airport the following day after receiving a phone call threatening her children if she did not do so. She stated that prior to Wilkerson's November 27 arrival, she had been cutting rods to place in closets. When appellant was told the law enforcement officers were going to dig up the well pursuant to the warrant, appellant told the officers if Wilkerson were found in the well she did not know anything about it. When searchers reported the discovery of the skeletal remains in the well, appellant was arrested.

A microanalyst for the forensic sciences and trace evidence division of the Georgia Crime Lab testified the corroded pipe found with the skeletal remains probably came from the closet rods found in appellant's home. Appellant's husband testified pursuant to an order granting him immunity and compelling his testimony.[3] He stated that upon his return to the Troup County home following the 1987 Thanksgiving trip to Florida, he found on the downstairs floor a

---

[3] The husband ended the couple's reconciliation when he filed for divorce in August 2003 after appellant, who had been living in North Carolina for five years, brought the man with whom she had been living into the Troup County marital home.

cocked and loaded Walther PPK .380 caliber gun that had been fired. In a 2003 conversation with appellant concerning division of marital property, appellant inquired about the gun and "was quiet about it" after the witness reminded her that was the gun "from 17 years ago during the Fred thing" and he had sold it at a gun show. Unbeknownst to the witness, appellant tape-recorded that conversation and the tape, discovered in appellant's purse when she was arrested a month later, was seized by the arresting officer and played to the jury.[4]

1. The evidence summarized above was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of malice murder and possession of a firearm during the commission of a crime. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant contends the trial court erred when it denied her motion to suppress the statements she made on September 30, 2003, during the execution of the search warrant at her home. Appellant maintains she was subjected to a custodial interrogation without having been advised of her rights pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). After presiding over a hearing conducted pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the trial court denied the motion to suppress, finding appellant had not been in custody when she made the statements.

To establish that the trial court erred in failing to suppress the statements she made before being advised of her *Miranda* rights, appellant must show she was both in custody and interrogated when she made the statements. *Ramsey v. State*, 272 Ga. 28 (2) (526 SE2d 842) (2000). The focus in the case at bar is on the first criterion — whether appellant was in custody. A person must be apprised of his *Miranda* rights prior to being questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way. . . ." *Miranda v. Arizona*, supra, 384 U. S. at 444. "A court should evaluate the second prong of the test objectively: an individual is in custody if a reasonable person in the place of the defendant would feel so restrained as to equate to a formal arrest. [Cits.]" *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001). Both the officer from the sheriff's department and the DA's investigator testified appellant was not under formal arrest during the execution of the search warrant, she moved about her home without restriction, she made and received telephone calls without

---

[4] Based on the contents of the tape, appellant's former husband was charged with tampering with evidence. In exchange for his testimony against appellant, the District Attorney agreed to dismiss the charge.

restraint, and she was free to leave the property. The fact that she was the focus of the investigation did not require the law enforcement personnel to give *Miranda* warnings. *Stansbury v. California*, 511 U. S. 318, 323-324 (114 SC 1526, 1529, 128 LE2d 293) (1994) (" 'Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. . . .' [Cit.] . . . 'The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings. . . .' [Cit.]"). We conclude the trial court did not err when it determined that a reasonable person in appellant's place would not have felt so restrained as to equate to a formal arrest. *Tolliver v. State*, supra, 273 Ga. at 786.

3. Appellant also contends the trial court erroneously admitted into evidence a videotaped conversation between appellant and the investigating officer from the sheriff's department. The conversation took place in the investigator's office three months after appellant was arrested, at a time when appellant was represented by counsel, and was not preceded by a recitation of appellant's rights under *Miranda v. Arizona*, supra, 384 U. S. 436. After conducting a *Jackson v. Denno* hearing, the trial court ruled the videotaped statement admissible, finding that appellant had voluntarily waived her *Miranda* rights and had given her statement freely and voluntarily without any hope of benefit or fear of injury.

The conversation at issue took place in the investigator's office as a result of appellant's letter to the investigator in which she stated she needed to see him. The investigator testified at the *Jackson v. Denno* hearing that, prior to the recorded conversation, appellant told him she wished to report a burglary at her home. During the videotaped conversation, appellant recited the details she knew about a break-in at her home, and then referred to the case pending against her. The investigator promptly told her he could not discuss the case with her because she was represented by an attorney. Appellant then told the investigator that if he would go with her to her house, she would "hand you . . . the evidence that will prove who did it, that will prove to you that I didn't."[5]

---

[5] In the videotaped conversation that was played for the jury but not transcribed, appellant reported the burglary and how she became aware of it, and complained about harassment which she was experiencing in the jail and which members of her family were experiencing. The investigator informed appellant he could not talk with her about that since she was represented by an attorney. Appellant then expressed concern for the whereabouts of certain unidentified items in her home, stating she would "hand you . . . the evidence that will prove who did it, that will prove to you that I didn't," if the investigator would take her to her home. Using the investigator's telephone, appellant called her attorney and informed him of her whereabouts and her conversation with the investigator. She concluded her conversation with her attorney with "Okay. I gotcha, I gotcha. Okay," and told the investigator the attorney wanted the

Whether appellant availed herself of her Sixth Amendment right "to have the Assistance of Counsel for [her] defense" or the prophylactic right under *Miranda v. Arizona* to have counsel present during custodial interrogation, thereby invoking her Fifth Amendment right against self-incrimination, either right protects her from the results of custodial interrogation initiated by law enforcement personnel and conducted without the presence of counsel. See *Michigan v. Jackson*, 475 U. S. 625 (106 SC 1404, 89 LE2d 631) (1986) (Sixth Amendment); and *McNeil v. Wisconsin*, 501 U. S. 171, 177 (111 SC 2204, 115 LE2d 158) (1991) (Fifth Amendment/*Miranda*). It is clear it was appellant who initiated the conversation in which she made the statement she sought to have suppressed, and it was appellant who persisted in telling the investigator about the purported existence of conclusively exculpatory evidence after the investigator reminded her he could not discuss the case in the absence of her attorney. Inasmuch as the investigator did not violate appellant's constitutionally-guaranteed rights, the trial court did not err when it denied the motion to suppress.

4. Appellant next takes issue with the trial court's admission into evidence of the skeletal remains of the victim. Prior to the testimony of the forensic anthropologist, the remains were laid out on a table in the courtroom and covered by a sheet. The State contended the presence of the remains was necessary because appellant contested the identity of the remains, and appellant asserted the prejudicial impact of the presence of the remains in the courtroom outweighed their probative value since the expert could testify to his findings without having the remains in the courtroom. During his testimony, the expert witness referred to the remains several times and was permitted to leave the witness chair and display pieces of the remains to the jury to illustrate his testimony. Using the skull, he showed the jury what attributes made the skull "most probably" that of a male human being, and he showed the jury the structure of the pelvis that was characteristic of being that of a man rather than a woman. He

---

investigator to call him. She then attempted to determine when the burglary of her home took place, and complained about her inability to obtain proper medication from jail officials. The investigator acknowledged that the attorney probably told appellant not to talk with the investigator and informed appellant "if you want me to believe what you're telling me, you've got to start the conversation. You've got to help me and in return I help you." Appellant responded they could talk after her attorney arrived and, referring to the purported evidence at her home, stated "I pray it's still there." She then complained about the difficulty in getting communications to the investigator from her jail cell and urged the investigator to look into the civilian who "pushed the hardest . . . to do the investigation. . . ." When she stated, "I just want to be able to prove beyond a shadow of a doubt that it's not me," the investigator replied, "If you can, you've got to convince me, too. I believe I'd convince me before I'd convince a twelve-member jury." The conversation concluded with instructions on how appellant could communicate with the investigator from jail in the future.

also pointed out the "oblong defect" in the skull caused by the gunshot, and the place in the right femur from which he had removed a bone fragment for mtDNA testing.

"Evidence must relate to the questions being tried by the jury and bear upon them either directly or indirectly. Irrelevant matter should be excluded." OCGA § 24-2-1. No one in the case at bar questions the relevancy of the remains of the victim of a homicide. The trial court, in the sound exercise of its discretion, may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." *Hicks v. State*, 256 Ga. 715, 720 (13) (352 SE2d 762) (1987). In most cases, photographic evidence is used to illustrate an expert's testimony regarding the victim's remains, and we generally have concluded that the probative value of the photos exceeds their prejudicial impact. See, e.g., *Jackson v. State*, 272 Ga. 429 (2) (531 SE2d 700) (2000); *Thornton v. State*, 264 Ga. 563 (9) (449 SE2d 98) (1994) (autopsy photos admissible to aid medical examiner in describing manner and cause of death). However, it is not without precedent to admit skeletal remains into evidence. In *Pressley v. State*, 205 Ga. 197, 207 (53 SE2d 106) (1949), skeletal remains were admitted and used to identify the victim through a comparison of the jawbone with the victim's dental records. This Court reversed the conviction because a properly authenticated copy of the victim's dental records was not placed in evidence, but noted that the dentist's testimony would have been proper had the dental records been proven and put in evidence. More recently, the Supreme Court of Kentucky rejected the argument that the prejudicial impact of partial skeletal remains used during the testimony of the state forensic anthropologist to illustrate his testimony outweighed their probative value. *Tamme v. Commonwealth*, 973 SW2d 13 (Ky. 1998). While the admission into evidence of the victim's actual remains is an unusual circumstance, the trial court did not abuse its discretion in admitting the remains in the case at bar since they were used to illustrate portions of the testimony of the expert witness.

5. Lastly, appellant complains the trial court erred when it permitted the son of the victim to testify he had no doubt that the skeletal remains were those of his father.[6] Prior to his statement of opinion, the witness had testified his father was wearing bluejeans when he disappeared, his father had dentures, and his father always carried lip balm. The skeletal remains were found in bluejeans of the

---

[6] On re-direct examination of the witness, the district attorney asked, "And any doubt in your mind, any doubt in your mind that the body we recovered from the well wasn't your daddy?" to which, over appellant's objection, the witness responded, "No."

size worn by the witness's father, lip balm of the brand used by the witness's father was found in a pocket of the bluejeans, and dentures were also found in the well.

A lay witness may give an opinion based upon the witness's personal observation and experience if the matter is one within the scope of the average juror's knowledge. *Weston v. State*, 276 Ga. 680 (3) (580 SE2d 204) (2003). With regard to skeletal remains, a lay witness may identify skeletal remains as those of a certain person where the lay witness can establish personal knowledge of an unusual factor peculiar to the skeletal remains themselves. See, e.g., *McVeigh v. State*, 205 Ga. 326 (53 SE2d 462) (1949) (victim's brother identified skeletal remains as those of his missing brother because of a dental filling contained in the skull that the witness had seen filled by a dentist); *Gray v. Commonwealth*, 101 Pa. 380 (1882) (daughter and a good friend of the victim were permitted to identify a skull and jawbone as that of the victim based on certain peculiarities of the jaw and mouth). In the case at bar, the witness's testimony underlying his identification of the remains was not based on something peculiar to the remains themselves, but was based on the circumstances in which the remains were found: the generic pair of pants in which the remains were found, the presence of lip balm in the pants' pocket, and the presence in the well of dentures which were not otherwise linked to the witness's father. Since the witness's opinion that the remains were undoubtedly those of his father was not based on factors peculiar to the remains, the admission of his opinion was inappropriate. However, inasmuch as "the evidence of guilt is so overwhelming that there is no reasonable probability that the verdict of the jury would have been different in the absence of this error" (*Belmar v. State*, 279 Ga. 795, 800 (621 SE2d 441) (2005)), the admission of the opinion testimony was harmless error.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 27, 2006.

*Word & Taylor, Gerald P. Word, Jerry F. Pittman,* for appellant.
*Peter J. Skandalakis, District Attorney, Stephen M. Gray, Assistant District Attorney, Thurbert E. Baker, Attorney General, Julie A. Adams, Assistant Attorney General,* for appellee.