**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 12, 2017**

# In the Court of Appeals of Georgia

A17A1116. STALLINGS v. THE STATE.

MERCIER, Judge.

Sierra Stallings was indicted in the Superior Court of Bibb County along with Jarvis Williams and Diondra Walker for offenses related to a series of armed robberies in Macon in 2012. Following a bench trial in which her co-defendant Williams testified as a witness for the State, Stallings was found guilty of one count of armed robbery and one count of aggravated assault, and not guilty on three other counts. Stallings appeals the convictions and trial court's denial of her motion for new trial, contending that the evidence was insufficient to support her convictions and that the trial court erred in denying her motion to suppress oral and written statements she gave to law enforcement officers. For the reasons that follow, we affirm in part, vacate in part, and remand the case with direction.

1. Stallings was charged jointly with Williams and Walker with attempted armed robbery and two counts of aggravated assault relating to an attempted armed robbery at a Sunrise store in Macon on April 18, 2012 (Counts 1, 2, and 3 of the indictment, respectively), and with armed robbery and aggravated assault relating to a robbery at a Kwik Trip store in Macon on April 30, 2012 (Counts 6 and 7, respectively).[1] Stallings was found not guilty on Counts 1, 2, and 3, and found guilty on Counts 6 and 7. She contends that the evidence was insufficient to support her convictions because the testimony of Williams, her co-defendant, was not sufficiently corroborated.

"On appeal the evidence must be viewed in the light most favorable to support the verdict, and [Stallings] no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998). "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, we must uphold the . .

---

[1] Williams and Walker were also charged with additional offenses, including offenses relating to an armed robbery at H&R Food Mart in Macon on April 18, 2012. Those charges are not at issue in Stallings's appeal.

. verdict." *Williamson v. State*, 285 Ga. App. 779, 780 (1) (648 SE2d 118) (2007) (citation omitted).

> Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. . . .A person is concerned in the commission of a crime only if he . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20 (a), (b) (3) and (4). In "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness." OCGA § 24-14-8.

Williams's testimony at trial demonstrated the following. On April 18, 2012, while Williams was with Stallings, he called Walker (also known as "Little Donkey") and discussed robbing a store. Williams told Stallings that he was going to rob a store, and Stallings loaned her car (a white Chevrolet Caprice) to him. At the Sunrise Store, Walker shot a clerk, and Williams and Walker tried unsuccessfully to take money. The two fled the scene in Stallings's car and returned her car to her. Later that day,

Williams and Walker committed a robbery at H&R Food Mart and took approximately five hundred dollars. Williams gave some of the stolen money to Stallings.

Later that same day, Williams was driving Stallings's car again, and approached a Georgia State Patrol roadblock. There were three firearms in the car, including the one used by Walker in the attempted armed robbery at the Sunrise Store, and Williams was afraid of being caught with firearms because he was a convicted felon. He abandoned the car and fled. Williams tried to telephone Stallings, and eventually another (unidentified) person reached her and instructed her to report that her car had been stolen.

On April 30, 2012, Williams, Walker and Stallings carried out a robbery at a Kwik Trip store. Williams and Stallings encountered Walker at a store, and while the three were talking, Stallings said, "we need to do something. We need to get some money." Williams understood her comment to refer to carrying out a robbery, because Stallings was aware that robbery was "what [Williams and Walker] did." Walker joined Williams and Stallings in Stallings's car and retrieved a pistol that was in the console. The three went to Williams's home, changed clothes, got some masks, and discussed which store to rob.

They went to a location near the Kwik Trip store, and Stallings decided to go "check out the scene at the store." She came back, said "it was clear," and stayed in the car, planning to be the getaway driver. Williams testified that he was "the watch out man," and that Walker carried out the robbery in the store using the pistol he had retrieved from Stallings's car. He described how he went into the store first, bought some items, and lingered inside, and then Walker came in with the gun that he took from Stallings's car and said "give it up." Williams and a woman in the store "got down on the floor." Walker left the store while they were still on the floor. After the robbery, Williams called Stallings to tell her where to pick him up, and when she arrived, Walker was already in the car. Williams, Walker and Stallings split the money from the robbery three ways. Williams testified that neither he nor Walker ever threatened Stallings. He also testified that neither he nor Walker intended to carry out a robbery that day until Stallings decided that she wanted to do it, and then the three of them planned it together.

A state trooper testified that he was conducting a road check on April 28, 2012 and he noticed a white Chevrolet Caprice approach the check point, then turn abruptly into a private drive. He saw someone run away from the car. An inventory search of the car revealed a nine-millimeter handgun and a ski mask. The car was registered to

Stallings, and while officers were conducting their inventory search, the car was reported stolen. The trooper testified that he spoke with Stallings that evening, and she said that her car had been stolen while she was unloading laundry and taking it to her apartment.

A patrol officer with the former Macon Police Department testified that Stallings's car was abandoned at the road check on April 28, 2012 at approximately 10:00 p.m. The patrol officer was dispatched at approximately 11:00 p.m. to take the theft report from Stallings, and she told him that the theft occurred at approximately 10:00 p.m. The patrol officer asked Stallings why she waited an hour to report the car stolen, and "[s]he didn't have an answer for that."

Security video footage from the Sunrise Store demonstrated various details of the attempted robbery which were consistent with Williams's testimony. A crime scene technician testified that a bullet and a spent cartridge case from a 9-millimeter gun were found at the Sunrise Store, and that the gun recovered from Stallings's car was a 9-millimeter caliber handgun. A forensic firearms scientist testified that, based on his tests, the bullet and cartridge case recovered from the Sunrise Store crime scene were fired from the gun that was recovered from Stallings's car.

6

Detective David Patterson was employed by the Macon Police Department in the Criminal Investigations Division in April 2012, and reviewed the case files of the armed robberies at the Sunrise Store, H&R Food Mart, and Kwik Trip. Because of the items found in Stallings's car and the circumstances of her theft report, Patterson thought that there might be some connection between her car and the robberies. He, Sergeant Kenneth Chapman and Investigator Carlos Stokes went to Stallings's home. Patterson asked Stallings to come to the detective bureau, and she agreed; she rode there with Chapman and Stokes, and Patterson "followed right behind them." At the detective bureau, Stallings told Patterson that she was scared when she reported the car stolen, and had lied to the patrol officer about the theft. She said that she had loaned her car to Williams and to someone known as "Little Donkey," but she did not know "Little Donkey's" real name. She said that Williams called her later on that night and told her to report her car stolen because he had abandoned it. A typed transcript of her oral statement to police (referred to herein as the "pre-*Miranda* statement") was prepared, which she signed and initialed.

While Patterson made copies of the signed transcript, Stallings waited in Chapman's office, because the detectives were going to arrange a ride home for her. While she was waiting, Chapman asked her if she knew anything else about the armed

7

robberies, and Stallings made a comment implicating herself in an armed robbery. Patterson then read a *Miranda* form to Stallings, and questioned her again. In her second statement (referred to herein as her "post-*Miranda* statement"), Stallings admitted her role in the April 30, 2012 armed robbery. Her post-*Miranda* statement was also transcribed. Stallings signed and initialed the typed transcripts of her statements, which were introduced at trial.

In her post-*Miranda* statement, Stallings told officers that she loaned her car to Williams and his friend "Little Donkey" on April 28 and she saw that they had a ski mask and a gun when she gave the car to them. In her pre-*Miranda* statement, Stallings had told investigators that on April 30 she dropped Williams and Walker off near the Kwik Trip store, and she saw them with a gun and ski mask that day. She said that the next time she heard from Williams or Walker was when she spoke with Williams on May 2, and he told her that he and Walker had committed a robbery at a "Citgo that day."

In her post-*Miranda* statement, however, Stallings said that on April 30 she dropped Williams and Walker off near the Kwik Trip store, and that she waited for them while they committed the robbery. She said that Walker had cash in his hands when he and Williams returned to her car, and that Williams and Walker still had a gun

8

and ski masks. Stallings said that she knew that they were going to commit the armed robbery, and she was afraid that Walker was going to shoot her.

A recording was tendered into evidence at trial, without objection, which the prosecutor described to the court as a "jail call" between Stallings and a party named Kitchens, as well as a person identified by Kitchens as "Little Donkey." In the recorded call, a man can be heard speaking to a woman (presumably Stallings) about a criminal case, and about what will happen if she and "Little Donkey" testify; he tells her that if she testifies she will "incriminate [herself]." He tells her that if she does not testify, "Little Donkey" will not testify.

Later in the call, the first man leaves the telephone conversation and a man identified as "Little Donkey" takes his place. The woman tells him that she has heard that "Walker" is going to "plead." "Little Donkey" makes a comment about getting "on the same page," says that if she testifies "they" can use her statements, tells the woman to "stick to the script," tells her that she was scared, refers to her having "made a mistake," and says that "now [she knows] what to do." "Little Donkey" tells the woman that he is "not a snitch," to which the woman replies, "I'm not."

Stallings testified at trial. She admitted that on April 18, 2012, she loaned her car to Williams, and later in the day she "[found] out" that Williams had committed a

robbery at the Sunrise Store earlier in the day. She admitted that on April 30, 2012, she drove Williams and Walker to an area approximately two blocks from the Kwik Trip store, and stated that she waited in her car while they went into some apartments, then drove them away when they returned approximately 30 minutes later. She testified that she overheard Williams and Walker discussing the robbery when they got back into the car, and that she was scared.

Stallings testified that several of the statements attributed to her in the transcript of her interview with law enforcement officers were false, and stated that she was confused when she spoke to them and that they were asking her too many questions. With regard to the Kwik Trip robbery on April 30, she admitted on cross-examination that she told police, among other things, that she saw that Williams and Walker had a gun and a ski mask; she knew that Williams and Walker were going to commit a robbery; and she waited for Williams and Walker to commit the robbery. She admitted that she had lied to the police about her car having been stolen. The prosecutor asked Stallings: "[T]wo days after lying to the police you drove Walker and Williams to the [K]wik Trip . . . so they could rob that store, you knew they had guns, you knew they had masks, you knew that they returned to your car after robbing the store with cash money in hand, you didn't call the police to report it, you didn't flee, you didn't drive

10

off, you sat there and waited as the getaway driver, isn't that correct?" She responded, "Yes sir."

We disagree with Stallings's argument that "[t]here is no direct evidence of her participation and no circumstantial evidence aside from her presence a few blocks away from the store." Williams's testimony at trial constitutes direct evidence that Stallings intentionally aided and abetted Williams and Walker in committing the crimes of armed robbery and aggravated assault,[2] and intentionally advised, encouraged, and counseled them to commit the crimes. See OCGA § 16-2-20; OCGA § 16-8-41; OCGA § 16-5-21. Stallings's argument that Williams's testimony was impeached at trial is irrelevant, because this Court does not weigh the evidence or determine the credibility of witnesses. Rather, that task is left to the fact-finder. See *Short*, supra; *Williamson*, supra.

Further, there was sufficient corroboration of Williams's testimony in the evidence admitted at trial, including the recorded telephone call of Stallings and Walker, Stallings's own testimony at trial, and Stallings's statements to law enforcement officers.

---

[2] Stallings does not dispute that Williams's and Walker's actions at the Kwik Trip store constitute armed robbery and aggravated assault.

11

The corroboration must be independent of the accomplice's testimony and it must connect the defendant to the crime or lead to the inference that [s]he is guilty. However, the corroborating evidence need not of itself be sufficient to warrant a conviction of the crime charged. Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. The corroborating evidence may be circumstantial.

*Short*, supra at 635 (1) (b) (citation and punctuation omitted). The evidence as summarized above included both direct and circumstantial evidence that corroborated Williams's testimony. Stallings's contention that there was "no circumstantial evidence aside from her presence a few blocks away from the store" is incorrect. Moreover, evidence demonstrating a defendant's presence near the scene of a crime can provide the slight corroboration of accomplice testimony required to support a conviction. See, e.g., *Dingler v. State*, 293 Ga. App. 27, 29 (1) (666 SE2d 441) (2008) (defendant's presence outside a barn where methamphetamine was located was sufficient to corroborate co-defendant's testimony that part of the methamphetamine belonged to defendant and defendant was there to pick it up). Here, a rational trier of fact could conclude that Williams's testimony was corroborated. See id.; *Short*, supra; OCGA § 24-14-8. Stallings argues that the circumstantial evidence in this case fails to

exclude every reasonable hypothesis except her guilt, pursuant to OCGA § 24-14-6. This argument is inapplicable here, where there was also direct evidence as discussed above. See *Allaben v. State*, 299 Ga. 253, 254-255 (1) (787 SE2d 711) (2016).

Stallings also argues that the trial court should have granted her motion for new trial pursuant to OCGA § 5-5-20 and 5-5-21. The evidence viewed in the light most favorable to the prosecution supports the verdicts here, and Stallings points to no indication in the record that the trial court incorrectly exercised its discretion. See *McMurtry v. State*, 338 Ga. App. 622, 624 (1) (791 SE2d 196) (2016). The trial court did not err in denying Stallings's motion for new trial on these grounds.

2. Stallings contends that the trial court erred in admitting the oral and written statements she gave to law enforcement officers because the statements were not voluntary and *Miranda* warnings were not properly given. She argues that her decision to accompany Patterson, Chapman and Stokes to the detective bureau was not voluntary but rather was a "submission to a claim of lawful authority"; that *Miranda* warnings should have been administered before she was questioned; that her first, pre-*Miranda* statement was not voluntary; that her waiver of her *Miranda* rights was not made voluntarily, knowingly, or intelligently; and that her second, post-*Miranda* statement should be suppressed because it was the "fruit of the first tainted statement."

13

Stallings argues that the officers' conduct amounted to "an improper 'Miranda in the middle' investigative procedure."

To be admissible at trial, Stallings's confession must "have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824.

> [I]n ruling on the admissibility of an in-custody statement, a trial court must determine whether, based upon the totality of the circumstances, a preponderance of the evidence demonstrates that the statement was made freely and voluntarily. Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a *Jackson v. Denno* hearing will be upheld on appeal.

*Butler v. State*, 292 Ga. 400, 403 (2) (738 SE2d 74) (2013) (citation omitted); *Daniel v. State*, 268 Ga. 9, 10 (2) (485 SE2d 734) (1997). "[T]he trial court's application of the law to undisputed facts is subject to de novo review." *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005).

> To establish that the trial court erred in failing to suppress the statements she made before being advised of her *Miranda* rights, appellant must show she was both in custody and interrogated when she made the statements. . . .A person must be apprised of [her] *Miranda* rights prior to being questioned by law enforcement officers after being taken into

14

custody or otherwise deprived of [her] freedom of action in any significant way. A court should evaluate the second prong of the test objectively: an individual is in custody if a reasonable person in the place of the defendant would feel so restrained as to equate to a formal arrest.

*Quedens v. State*, 280 Ga. 355, 358 (2) (629 SE2d 197) (2006) (citations and punctuation omitted).

The United States Supreme Court in *Missouri v. Seibert*, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004), disapproved the application of a "two-step" interrogation technique. As summarized by the Supreme Court of Georgia:

In *Seibert*, the officers arrested the accused, subjected her to custodial questioning, obtained a confession, and only then complied with the mandate of *Miranda*. Thereafter, a signed waiver was obtained from the arrestee and she gave a second confession. Under these circumstances, the Supreme Court of the United States held that both statements were inadmissible, concluding that it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Wiggins v. State*, 280 Ga. 627, 629 (2) (632 SE2d 80) (2006) (citing *Seibert*, supra at 614 (IV)). The Court identified in *Seibert*

[a] series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, supra at 615 (V).

However, "[w]here an accused is neither in custody nor so restrained as to equate to a formal arrest, any statements made to an investigating officer are made under noncustodial circumstances and *Miranda* warnings are not required." *Wiggins*, supra (citation and punctuation omitted). Where there is no *Miranda* violation, a defendant's post-*Miranda* statements are not inadmissible under *Seibert*. See *Drake v. State*, 296 Ga. 286, 290 (2), n. 3 (766 SE2d 447) (2014); *Walker v. State*, 296 Ga. 161, 170-171 (3) (a) (766 SE2d 28) (2014).

At the hearing on Stallings's motion to suppress the statements she made to law enforcement officers, the State called Detective Patterson, Sergeant Chapman, and Investigator Stokes to testify about the circumstances surrounding Stallings's ride to the detective bureau, the circumstances of their conversations with her, and the

statements she made at the bureau. Their undisputed testimony indicated that, among other things, Stallings went to the detective bureau with the officers voluntarily; no one acted in a threatening or intimidating manner to her; no threats, offers or promises were made to her; she was free to leave during the time before *Miranda* warnings were read to her, including when she made her first, pre-*Miranda* statement to the officers as described in Division 1 above; she appeared to understand the rights that were read to her; and she never asked for an attorney or indicated that she did not wish to speak to the officers. Patterson and Chapman testified that when Stallings made a comment about having been involved in a robbery, *Miranda* warnings were read to her.

Following the hearing on Stallings's motion to suppress, the trial court denied her motion, finding that she "was not in custody when the first statement was taken," and that "[t]he second statement was taken after [Stallings] was properly advised of her rights under *Miranda.*" The court also found that "[a]t no time did [Stallings] invoke her right to an attorney and both statements were freely and voluntarily given."

Following the hearing on Stallings's motion for new trial, the trial court found, among other things, that "neither custody nor interrogation were present prior to the administration of the *Miranda* warnings"; that there is "no evidence in the transcript or [motion for new trial] to show that Stallings's *Miranda* waiver was involuntary";

17

and that because the first, pre-*Miranda* statement was voluntary, any argument that the second, post-*Miranda* statement was inadmissible as "fruit of the poisonous tree" was without merit.

We note that the trial court stated in its order denying her motion for new trial that "[Stallings] offers no evidence that she was in custody, or the functional equivalent, when she drove herself to the police station." However, no evidence presented at the motion to suppress hearing or at trial indicated that Stallings drove herself. Rather, the testimony indicated that Stallings was taken to the detective bureau by law enforcement officers. Thus, it appears that the trial court's determinations that Stallings was not in custody when she made her pre-*Miranda* statement, and that said statement was voluntary, were based at least partly on a material factual finding that was clearly erroneous. See *Butler*, supra. The trial court's determination that Stallings's post-*Miranda* statement was admissible is dependent on its findings with regard to the pre-*Miranda* statement.

We therefore vacate the trial court's order denying Stallings's motion for new trial, and remand this case for the court to make new findings of fact, and conclusions of law based thereon, as to the voluntariness of Stallings's statements. In so doing, we remind the court of the preference that a trial court's findings with regard to the

administration and waiver of *Miranda* rights take the form prescribed in *Berry v. State*, 254 Ga. 101, 104 (1), n. 6 (326 SE2d 748) (1985).

*Judgment affirmed in part, vacated in part, and case remanded with direction. Barnes, P. J., and McMillian, J., concur.*