**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**January 2, 2020**

# In the Court of Appeals of Georgia

A19A2326. THE STATE v. RICHARDSON.

PHIPPS, Senior Appellate Judge.

On appeal from an order suppressing statements made at and evidence recovered from the scene of a car hijacking, the State asserts that the evidence should not have been suppressed because defendant Darieuq Richardson's self-incriminating statements were voluntarily made. We agree as to Richardson's first statement to police, made before he was arrested, and we therefore reverse in part and vacate in part.

> [I]n reviewing a ruling on the admissibility of a defendant's statements where the facts are disputed, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the law to the facts. . . . [A] reviewing court may consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions

of credibility, such as facts indisputably discernible from a videotape. On the other hand, to the extent that legally significant facts were proved by evidence other than the video recording, the trial court as fact-finder was entitled to determine the credibility and weight of that other evidence.

(Citations and punctuation omitted.) *State v. Abbott*, 303 Ga. 297, 299 (1) (812 SE2d 225) (2018).

Thus viewed in favor of the trial court's judgment, including those facts "indisputably discernable" from the videotape of Richardson's arrest, *Abbott*, 303 Ga. at 299 (1), the record shows that at around 10:00 p.m. on the evening of January 22, 2018, a Douglas County deputy responded to a domestic dispute call at the apartment where Richardson lived with his mother and sister. The mother said that Richardson had been drinking and described her son to police as wearing a black hoodie and dark pants. The deputy promised to "try to find him and see if he would come home."

At approximately 5:00 on the following morning, while it was still dark, the same deputy was recalled to the same apartment complex by a 911 call reporting a car hijacking and attempted armed robbery. The caller told police that he had left his car running to warm up in the winter weather before returning to the car, at which time he saw a young man standing at the top of the stairwell in the breezeway. As the

2

victim approached his car, the young man, who was wearing a black hoodie with white spots on the right rear shoulder and dark jeans and was carrying a gun, came up behind the victim and demanded his car keys and wallet. The victim threw his wallet onto the ground and ran away, with the young man in pursuit. The victim later returned to the apartment parking lot, retrieved his wallet, and ran to the entrance of the complex, where he called 911. The first deputy noted the resemblance between the suspect and the description given of Richardson earlier that night.

The two deputies now on scene accompanied the victim back to his car, which was parked within view of Richardson's apartment. The car's engine was still running, but its windshield was shattered, and a fire extinguisher was underneath its front. As shown on the officers' bodycam videos, the first deputy saw blinds moving in the front window of Richardson's apartment. When the officers knocked on the door, Richardson's mother answered. The officers asked her whether Richardson was there and if they could "talk to him for just a second." The mother agreed, and shortly thereafter, with the second deputy's gun drawn, Richardson walked out of the apartment with his hands in the air, saying, "I ain't got nothing on me." He was wearing a black hoodie with white markings on the right rear shoulder. The first

3

deputy then placed Richardson in handcuffs, instructing him to "put your hands up until I can figure out what is going on." The following conversation then occurred:

[Investigator:] Let's turn [Richardson] around so [the victim] doesn't see him in cuffs. *Do you want to tell us what you did tonight?*

[Richardson:] Yes, sir.

[Investigator:] Tell us what you did then.

[Richardson:] Something dumb.

[Investigator:] What did you do? [Deputy 1, also in response:] Yeah, I can imagine.

[Richardson:] *I had a BB gun.*

[Deputy 1:] Where is it at? [Investigator:] Did you try to get the guy's car?

[Richardson:] Yes, sir.

[Deputy 1:] Where is the BB gun at?

[Richardson:] In there. [Pause.] I'm sorry.

[Deputy 1:] I came out here earlier tonight because your sister called about you and your momma getting into it.

4

[Richardson:] Yes, sir.

[Deputy 1:] Your momma said she was pissed at you about drinking alcohol or something. So when the dude, uh, well, never mind. *You know you have the right to remain silent. [Richardson nods.] Anything you say can and will be used against you in a court of law.*

[Richardson:] Yes, sir.

[Deputy 1:] *You have the right to have an attorney present before any questioning.*

[Richardson:] Yes, sir.[1]

[Deputy 1:] You want to answer questions without an attorney present?

[Richardson:] I don't care.

[Deputy 1:] Okay, it's not I don't care. It's yes or no.

[Richardson:] Yes, sir.

---

[1] As the deputy admitted at the hearing, this reading of the *Miranda* warning omitted the portion as to Richardson's right to a court-appointed attorney if he could not afford his own. See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

(Emphasis supplied.) In response to further questions, Richardson admitted to chasing the victim, having the BB gun in the front room, and looking out the front window at police.

Based on this first statement, the second deputy got the mother's permission to search the family's apartment and recovered the BB gun. The victim identified Richardson, at which point the officers considered him under arrest, though they did not tell him so. The first deputy then walked Richardson into the parking lot, during which time Richardson responded to further questions about the location of the gun and placed him in the patrol car. There, the second deputy read Richardson his *Miranda* rights once again, though without inquiring as to whether Richardson understood them. The second deputy then asked Richardson again whether he wanted to talk, to which Richardson responded, "Yes." Richardson then acknowledged that he had smashed the victim's car window with the fire extinguisher, had stolen the BB gun from Walmart, and that he was sorry.

Richardson was charged with car hijacking, attempted armed robbery, aggravated assault, and second-degree criminal damage to property. Richardson moved to suppress his statements and other evidence, including the victim's on-scene identification, on grounds including that he had not been given the *Miranda* warnings

before being interrogated. After a hearing, including testimony from the two deputies and the introduction of their bodycam videotapes, the trial court filed an order holding that although the on-scene identification was not impermissibly suggestive and police had probable cause to arrest Richardson, all of his statements were involuntary as a result of the officers' failure to read him a complete *Miranda* warning at any time. The trial court also suppressed the BB gun as the tainted fruit of these involuntary statements.

On appeal,[2] the State argues that the trial court erred when it concluded that Richardson's statements were not voluntary and when it suppressed his statements and the BB gun as a result. We agree in part.[3]

1. *Richardson's first statement.*

---

[2] See OCGA § 5-7-1 (a) (4) (authorizing a direct appeal from a judgment "suppressing or excluding evidence illegally seized").

[3] As a preliminary matter, we reject the State's passing assertion that it did not have proper notice of Richardson's challenge to the admission of his statements on the grounds that they were involuntary. Richardson's filed motion asserted that because Richardson was not properly Mirandized, his statement was obtained in violation of his Fifth Amendment right against compelled self-incrimination. See *Benton v. State*, 302 Ga. 570, 573 (2) (807 SE2d 450) (2017) (*Miranda* warnings "are intended to preserve a defendant's Fifth Amendment right against self-incrimination").

7

A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary. Thus, the proper inquiry is how a reasonable person in [the defendant's] shoes would have perceived his situation.

(Citations and punctuation omitted.) *State v. Troutman*, 300 Ga. 616, 617 (1) (797 SE2d 72) (2017). It is well-established that the mere use of handcuffs does not, without more evidence of force, render a person's statements during an investigative stop involuntary. *Stringer v. State*, 285 Ga. 842, 844-845 (2) (684 SE2d 590) (2009) ("Officers may handcuff a suspect during an investigatory stop when such action is either reasonable under the circumstances to protect themselves or the public, or to maintain the status quo") (citation and punctuation omitted), disapproved on other grounds, *State v. Sims*, 296 Ga. 465, 469 n. 7 (2) (a) (769 SE2d 62) (2015).

The videotape before us confirms the officers' testimony that they placed Richardson in handcuffs for their own safety and for purposes of conducting a second-tier investigatory stop lasting approximately three minutes. See *Stringer*, 285 Ga. at 845 (2); *New York v. Quarles*, 467 U. S. 649, 657 (104 SCt 2626, 81 LE2d 550) (1984) (no constitutional violation when police failed to read *Miranda* warnings

8

while apprehending a suspect and when "confronted with the immediate necessity of ascertaining the whereabouts of a gun" discarded by the defendant). "[W]here an accused is neither in custody nor so restrained as to equate to a formal arrest, any statements made to an investigating officer are made under noncustodial circumstances and *Miranda* warnings are not required." (Citation and punctuation omitted.) *Stallings v. State*, 343 Ga. App. 135, 143 (2) (806 SE2d 613) (2017). *Miranda* warnings were not necessary during this brief period, which ended when the victim identified Richardson as his assailant and Richardson was taken to the patrol car. See *State v. Price*, 322 Ga. App. 778, 781 (746 SE2d 258) (2013) (an investigatory traffic stop "was not elevated into an arrest by removing [the defendant] from [a] vehicle and handcuffing him" pending the outcome of the investigation); *Parker v. State*, 326 Ga. App. 175, 179 (3) (754 SE2d 409) (2014) (reasonable suspicion "developed into probable cause" justifying arrest when the victims identified the defendant as among their assailants).

But even assuming that Richardson should have been Mirandized immediately after being placed in handcuffs, the Supreme Court of Georgia has held that a "failure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained," but

9

such a failure "'does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised.'" *Norwood v. State*, 303 Ga. 78, 82 (2) (a) (810 SE2d 554) (2018), quoting *Oregon v. Elstad*, 470 U. S. 298, 310 (105 SCt 1285, 84 LE2d 222) (1985) (citation omitted); see also OCGA § 24-8-824 (mandating the exclusion of incriminatory statements induced by "the slightest hope of benefit or remotest fear of injury"). Even when a defendant is in custody for some hours, our Supreme Court has held that a trial court errs in concluding that a statement taken without *Miranda* warnings is involuntary in the absence of any evidence of "extreme tactics identified as the hallmarks of coercive police activity" such as "lengthy interrogation, physical deprivation, brutality, or deception." *Troutman*, 300 Ga. at 618-619 (2) (citations and punctuation omitted) (reversing a trial court's finding that a confession obtained during a 2-hour 45-minute interrogation and a 9-hour detention, with an instruction that defendant was not free to leave and without *Miranda* warnings, was involuntary).

Richardson argues that the officers in this case deployed the two-step strategy of "question first and warn later" disapproved in *Missouri v. Seibert*, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004). See *Wiggins v. State*, 280 Ga. 627, 629 (2) (a)

10

(632 SE2d 80) (2006); *Stallings*, 343 Ga. App. at 142-143; *Abbott*, supra, 303 Ga. at 304 (3) (vacating and remanding for findings as to whether investigators deliberately employed such a strategy). This trial court made an explicit finding, however, that the officers' failure to read Richardson his rights before the onset of questioning, as well as their omission of portions of the warning before and after his arrest, was "inadvertent" – a credibility determination that we cannot ignore. *Abbott*, 303 Ga. at 299 (1) ("Credibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact") (citation and punctuation omitted).

Here, Richardson's first conversation with police, which almost immediately raised the necessity of locating the gun used in the hijacking, was a matter of a few minutes in a noncustodial setting, and the videotape of the incident provides "no evidence that [he] was threatened, coerced, or given a hope of a benefit in exchange for [his] statement." *Norwood*, 303 Ga. at 83 (2) (a). Even assuming that the officers erred when they failed to Mirandize Richardson immediately, his initial response to questioning "had none of the earmarks of coercion," and the officers also did not "exploit the unwarned admission to pressure [him] into waiving [his] right to remain silent." Id. (citation and punctuation omitted). Under these circumstances, we must

11

conclude that the trial court erred when it granted Richardson's motion to suppress those statements made before his arrest, and when it also suppressed the gun later recovered from the apartment, which the victim described in the first moments after he was detained, as fruit of the poisonous tree. Id. at 83-84 (2) (affirming trial court's denial of defendant's motion to suppress a statement made before a *Miranda* warning); *Troutman*, 300 Ga. at 618-619 (2) (reversing a trial court's finding that a 2-hour 45-minute interrogation without *Miranda* warnings, during a 9-hour detention from which defendant was not free to leave, rendered a confession involuntary); see also *United States v. Patane*, 542 U.S. 630, 643 (IV) (124 SCt 2620, 159 LE2d 667) (2004) (plurality opinion) ("fruits" doctrine should not apply to physical evidence, such as a firearm, because "the exclusion of unwarned [but voluntary] statements is a complete and sufficient remedy for any perceived *Miranda* violation") (citation and punctuation omitted).

2. *Richardson's statements after his arrest.* Neither the parties nor the trial court have considered in any detail whether, independent of Richardson's first statement, the statements made after the victim's identification and Richardson's

arrest were properly excluded. We therefore vacate the remainder of the trial court's order and remand for further proceedings consistent with this opinion.

*Judgment reversed in part and vacated in part. McFadden, C. J., and McMillian, P. J., concur.*